UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    - against -

CHRISTOPHER COLLINS,
CAMERON COLLINS, and
STEPHEN ZARSKY,

          Defendants.

S1 18-CR-567 (VSB)

**SENTENCING MEMORANDUM ON BEHALF OF
CAMERON COLLINS**

CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, New York 10022

*Attorneys for Cameron Collins*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................... 1

I.  CAMERON'S PERSONAL BACKGROUND AND CHARACTER ........................... 3

    A.  Cameron's Family, Childhood, and Education ................................. 3

    B.  Cameron's Commitment to Service, Inclusion, and Kindness ........................... 6

        1.  Cameron's Dedication to and Lessons Learned from Scouting ........................... 6

        2.  Simple, Quiet Acts of Kindness and Inclusion Define Cameron's Character ........................... 8

        3.  Volunteerism and Service to Others ........................... 11

    C.  Cameron's Relationship with Lauren Zarsky and Her Family ........................... 13

        1.  The Beginning of Lauren's and Cameron's Relationship ........................... 13

        2.  Lauren's Family Embraces Cameron ........................... 14

        3.  Cameron's and Lauren's Future Plans ........................... 16

II.  RELEVANT SENTENCING CONSIDERATIONS ........................... 17

    A.  The Offense Conduct and Plea Agreement ........................... 19

        1.  The Offense Conduct ........................... 19

        2.  The Plea Agreement ........................... 21

    B.  The Section 3553(a) Factors ........................... 21

        1.  The Guidelines Enhancement Associated with Gain or Loss Is Not a Fair Measure of the Offense Conduct in this Case ........................... 22

        2.  Cameron's Life and Character Counsel in Favor of Probation ........................... 28

        3.  The Nature and Circumstances of the Offense Counsel in Favor of Probation ........................... 32

        4.  A Non-Custodial Sentence of Probation Coupled with Community Service and a Significant Fine Provides Sufficient Deterrence and Just Punishment ........................... 37

        5.  A Non-Custodial Sentence of Probation Avoids Unwarranted Sentencing Disparities ........................... 41

        6.  A Non-Custodial Sentence of Probation with a Substantial Community Service Requirement and a Significant Fine Is Appropriate ........................... 47

III.  CONCLUSION ........................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007) .................................................................................*passim*

*Koon v. United States*,
518 U.S. 81 (1996) ................................................................................17

*Nelson v. United States*,
555 U.S. 3520 (2009) ............................................................................17

*Rita v. United States*,
551 U.S. 338 (2007) ..............................................................................17

*SEC v. Deeba*,
No. 4:18-cv-05346 (N.D. Cal. Aug. 30 2018) ......................................46

*SEC v. Lawson*,
No. 3:14-cv-02157 (N.D. Cal. May 12, 2014).......................................45

*SEC v. MacDonald*,
No. 1:09-cv-05352-HB (S.D.N.Y. June 10, 2009)................................46

*SEC v. Williky*,
No. 1:15-cv-00357 (S.D. Ind. Mar. 2, 2015) .......................................45

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................... 23, 28, 31

*United States v. Bailin*,
No. 05 Cr. 48-01 (SWK), 2008 U.S. Dist. LEXIS 70365 (S.D.N.Y. Sept. 18,
2008)........................................................................................................40

*United States v. Binday*,
804 F.3d 558 (2d Cir. 2015) .................................................................27

*United States v. Blaszczak*,
No. 1:17-cr-00357-LAK-1 (S.D.N.Y. Sept. 13, 2018).........................35

*United States v. Brady*,
No. 02 CR 1043(JG), 2004 WL 86414 (E.D.N.Y. Jan 20, 2004)........47

*United States v. Brennan*,
395 F.3d 59 (2d Cir. 2005) ...................................................................41

*United States v. Burnell*,
    367 F. Supp. 3d 12 (E.D.N.Y. 2019)......................................................................39

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) ...............................................................................41

*United States v. Chow*,
    No. 1:17-cr-00667-GHW-1 (S.D.N.Y. Nov. 20, 2018)..................................36, 43

*United States v. Colasuonno*,
    697 F.3d 164 (2d Cir. 2012) ...............................................................................40

*United States v. Contorinis*,
    No. 1:09-cr-01083-RJS-1 (S.D.N.Y. Dec. 17, 2010).........................................29

*United States v. Dorvee*,
    616 F.3d 174 (2d Cir. 2010) ..........................................................................40, 41

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004).................................................................39

*United States v. Faibish*,
    No. 1:12-cr-00265-ENV-1 (E.D.N.Y. Mar. 10, 2016).......................................26

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ...................................................23, 27, 29

*United States v. Gupta*,
    No. 1:11-cr-00907-JSR-1 (S.D.N.Y. Oct. 24, 2012).........................................38

*United States v. Hobson*,
    No. 1:16-cr-00351-LTS-2 (S.D.N.Y. Mar. 15, 2017) .............................34, 42, 43

*United States v. Holzer*,
    No. 1:09-cr-00470-VM-1 (S.D.N.Y. Sept. 29, 2009) .........................................30

*United States v. Johnson*,
    No. 16-CR-457-1 (NGG), 2018 U.S. Dist. LEXIS 71257 (E.D.N.Y. Apr. 27,
    2018)....................................................................................................................23

*United States v. Joseph Collins*,
    No. 1:07-cr-01170-LAP-1 (S.D.N.Y. July 15, 2013).........................................31

*United States v. Knights*,
    534 U.S. 112 (2001) ............................................................................................40

*United States v. Leitch*,
    No. 11-CR-000609 (JG), 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013)...............40

*United States v. McClatchey*,
    No. 1:16-cr-00369-KPF-2 (S.D.N.Y. Jan. 11, 2017) ..................................................... 33, 43

*United States v. Peterson*,
    No. 1:11-cr-00665-RPP-1 (S.D.N.Y. Oct. 11, 2011) ............................................................30

*United States v. Rogiers*,
    No. 1:17-cr-00503-AJN-5 (S.D.N.Y. Dec. 14, 2018) ..........................................................44

*United States v. Rosen*,
    No. 1:11-cr-00300-JSR-1 (S.D.N.Y. May 7, 2012) ............................................................24

*United States v. Stewart*,
    No. 1:15-cr-00287-LTS-3 (S.D.N.Y. Apr. 27, 2016)......................................................43, 44

*United States v. Zoquier*,
    No. 1:17-cr-00503-AJN-4 (S.D.N.Y. Mar. 6, 2019)......................................................37, 43

**Statutes**

18 U.S.C. § 3553(a) ...........................................................................................................*passim*

28 U.S.C. § 994(j) .......................................................................................................................25

U.S.S.G. § 2B1.1............................................................................................................ 18, 26, 27

U.S.S.G. § 2B1.4..................................................................................................................21, 26

U.S.S.G. § 3C1.1 ........................................................................................................................ 21

U.S.S.G. § 3E1.1.........................................................................................................................21

**Other Authorities**

*A Report on Behalf of the American Bar Association Criminal Justice Section
Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov.
10, 2014), *available at*
https://www.americanbar.org/content/dam/aba/publications/criminaljustice/ec
onomic_crimes.pdf........................................................................................................24

Daniel S. Guarnera, *A Fatally Flawed Proxy: The Role of "Intended Loss" in the
U.S. Sentencing Guidelines for Fraud*, 81 Mo. L. Rev. 715, 719 (Summer,
2016)........................................................................................................................................23

Mark W. Bennett *et al.*, *Judging Federal White-Collar Fraud Sentencing: An
Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev.
939, 984, 989 (Mar. 2017) ...................................................................................................26

U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* (Apr. 30, 2015), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf................................25

United States Courts Probation and Pretrial Services Office, *Overview of Probation and Supervised Release Conditions* (Nov. 2016), *available at* https://www.uscourts.gov/sites/default/files/overview_of_probation_and_supe rvised_release_conditions_0.pdf...........................................................................41

Through counsel, Cameron Collins respectfully submits this memorandum and accompanying exhibits to assist the Court in determining an appropriate sentence. Sentencing is scheduled for January 23, 2020.

## PRELIMINARY STATEMENT

Cameron Collins is a quiet and kind young man. In late June 2017, Cameron made a terrible, life-altering mistake motivated by panic, fear, and, more than anything else, his hallmark concern for others. He reacted to an emotional conversation with his father and, in a moment of weakness, tipped others and traded himself based on material nonpublic information his father shared. Cameron deeply regrets that his aberrant behavior and bad judgment placed those he loves dearly, his fiancée, Lauren Zarsky, and her family, in harm's way. Cameron's actions, and their impact on those he loves, will weigh on him throughout his life. His remorse is genuine and heartfelt.

Cameron's life provides necessary context to his actions in this case, but, perhaps more importantly, demonstrates Cameron's true character and nature. Both before and after these events, Cameron quietly served others and acted kindly. He dedicated himself to small projects and noble achievements. Cameron included others and befriended those in need. To say that he is an otherwise law-abiding citizen with an unblemished record is an understatement. Cameron is a role model to others, an Eagle Scout, someone who gives willingly without expectation of receiving anything in return. Cameron continued to lead that life during this ordeal, and he will continue to lead it when this is over.

Cameron's conduct in this matter is beyond question an aberration. As the government recognized, "[i]t [was] a one-event, one-stock, three-defendant scheme that took place over five days." Gov't Opp'n to Defs.' Pretrial Mots. at 8 (Mar. 8, 2019), ECF No. 69. As the

Presence Investigation Report (the "Report" or "PSR") observes, Cameron "had a moment of weakness and executed bad judgment." PSR at 31. Nothing like this ever occurred before, nor will it again given the harsh lessons Cameron has learned from this experience.

The Probation Department recognized Cameron's unique qualities and the aberrant nature of this offense within an otherwise law abiding life. The sentencing recommendation within the final Report accordingly accounts for a significant variance from the advisory Guidelines range. PSR at 29-31. In recognition of Cameron's personal characteristics and weighing those against the totality of the circumstances, including the objectives of sentencing, we respectfully request further leniency from the Court.

As this memorandum, the attached letters from those who know Cameron best, and the Probation Department's Report demonstrate, Cameron's conduct in late June 2017 and his untruthful statements about that conduct to the FBI in April 2018 deviated markedly from the way he has otherwise lived his life. Cameron is an unassuming young man devoted to his family and loved ones, committed to serving others, and dedicated to causes he deeply cares about. His concern for Lauren and her family informed Cameron's misguided decision to share inside information with the Zarskys, and to agree with them that they should trade. Cameron believed that the Zarsky family did not have the means to withstand a significant financial loss and he feared losing Lauren. Cameron learned painful lessons from his mistakes. He has a felony record. He received a permanent injunction in the related Securities and Exchange Commission ("SEC") civil case. He disgorged $634,299 to the SEC. PSR ¶ 115. He bore disproportionate media coverage and attendant public shame for his crimes due to his father's former status as a member of Congress. *Id.* These lessons are painful and permanent. Cameron will not stray from his otherwise law-abiding path again.

Yogi Berra purportedly once said: "It's tough to make predictions, especially about the future." Yet that is, in a sense, exactly what the Court must do here. The Court must balance the life that Cameron has led and continues to lead against his aberrant, atypical conduct in this case to determine his sentence. Cameron's accomplishments during his young life, his consistent traits of kindness and generosity from a young age, his humble nature, his dedication to service, the nature of the instant offense, and the need to avoid disparities with recent sentences in insider-trading cases all counsel against a sentence of imprisonment. Far from any hint of danger, Cameron has and will continue to benefit society. As such, a non-custodial sentence of probation including significant community service and a substantial fine is sufficient to achieve the sentencing goals of 18 U.S.C. § 3553(a).

## I.    CAMERON'S PERSONAL BACKGROUND AND CHARACTER

### A.    Cameron's Family, Childhood, and Education

Cameron Christopher Collins was born on ▮▮▮▮▮▮ in Buffalo, New York. PSR ¶ 86. He is the younger of two children born to Christopher Collins and Mary Collins, and has an older half-sister, Carly, born from his father's prior marriage. PSR ¶ 86. Cameron was blessed by being born into a good, stable family. He grew up in Clarence – a small, quiet town outside of Buffalo – and was raised Catholic. PSR ¶ 87. Cameron continues to practice his faith, which is important to him, as a member of ▮▮▮▮▮▮ parish.

Cameron had a good childhood and maintains a close, loving relationship with his family. PSR ¶¶ 86-87. His mother, Mary, is a homemaker. PSR ¶ 86. His sister, Caitlin, worked as an attorney until recently ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* Cameron's father recently served as a Congressman representing the 27th District of New York. *Id.* ¶ 18.

Despite his reserved nature, at a very young age Cameron developed a curiosity for the world around him. Ex. A, M. Collins Letter at 1.[1] Indeed, after learning to walk at six months old, Cameron "proceeded to need stitches on his face three times before he was a year old, from falls he encountered in his excitement to explore the world." *Id*. This curiosity and desire for exploration often led Cameron to his home's basement workshop or garage where he busily built and tinkered with various creations. Ex. A, M. Collins Letter at 1; Ex. A, T. Jehle Letter at 4. It led to his and friend's backyards, where Cameron and his friends built makeshift wooden forts for all to enjoy. Ex. A, D. Shine Letter at 5.

This curiosity also led Cameron to hone his athletic talents at a young age. At only two years old, Cameron discovered gymnastics, a sport that he loved. Ex. A, M. Collins Letter at 1. Cameron dedicated himself to gymnastics, spending countless hours at practice and meets. *Id*. By eighth grade, Cameron earned his spot as the New York State boys' gymnastics champion on vault. Ex. A, M. Collins Letter at 1; Ex. A, T. Jehle Letter at 4. During middle and high school, Cameron also tried out for and excelled at varsity soccer and lacrosse. Ex. A, M. Saeli Letter at 6; Ex. A, K. Chevli Letter at 8; *see also* PSR ¶ 87.

Cameron attended the local elementary and middle schools in Clarence. Ex. A, P. Corwin Letter at 9. Although he had a number of friends in Clarence, Cameron wanted more of a challenge. Ex. A, M. Collins Letter at 2. He applied for and then attended Nichols High School in the city of Buffalo. PSR ¶ 100. Nichols is a rigorous, private institution for children in grades 5-12. Although new to a school where most of the students already knew each other from attending earlier grades together, Cameron quietly distinguished himself among his peers.

---

[1] Pursuant to the Court's Individual Rules, letters in support have been filed via ECF as Exhibit A. Page numbers appear to the bottom right corner of Exhibit A to allow for pin cite identification. Exhibit A will be cited as "Ex. A, [Sender] Letter at [page]."

Ex. A, M. Collins Letter at 2. They quickly identified him as a natural leader. *Id*. After attending Nichols High School for only two months, Cameron ran for class president as part of the annual elections for class officers. *Id*. Cameron won the election, but true to his reserved, unassuming nature, Cameron did not share the news of his victory with his parents. *Id*. Mr. and Mrs. Collins did not know Cameron won the election until his mother asked him about it months later. *Id*.

At Nichols, Cameron became known as a "bright-eyed, intelligent, and honest student who was always eager to learn." Ex. A, E. Sauer Letter at 10. Cameron possessed a quiet demeanor, and established himself as a reliable and hardworking student who thrived when it came to science and engineering. *Id*. Cameron worked diligently in the classroom to learn all he could, humbly accepted criticism, and sought additional help when needed. *Id*. Recognized as a leader of his senior year engineering class, Cameron, with his engineering mind and love of building, successfully represented Nichols at local events and competitions. Ex. A, M. Collins Letter at 2; Ex. A, E. Sauer Letter at 10. At one such event, Cameron won the physics, sumo-bot, and trebuchet catapult competitions. Ex. A, M. Collins Letter at 2; *see* Ex. C (pictures of robotic beverage dispenser that Cameron designed and built).

Cameron's success at Nichols led him to Villanova University. *See* PSR ¶ 101. As an undergraduate at Villanova, Cameron continued to find his home in science and engineering, majoring in electrical engineering. *Id*. He graduated in 2015 with his bachelor's degree, earning the *cum laude* distinction. *Id*. In addition to his academic commitments, Cameron's continued passion for designing, fixing, and creating led him to invent and build several mechanical and electrical creations during college. Ex. A, J. Carey Letter at 12. Cameron's creations included a "smart" security camera for his dorm room (before such things became commonplace). *Id*.

Cameron is that person who does not discard something inoperable or broken without trying to fix it first. Ex. A, F. Stransky Letter at 13.

**B. Cameron's Commitment to Service, Inclusion, and Kindness**

With privilege comes responsibility, and born into a well-to-do family, Cameron embraced that responsibility from an early age by living a life of service, inclusion, and kindness. He is thoughtful and passionate about causes near to his heart. He is a steadfast and loyal friend. Cameron is also humble, and he exhibits kindness and generosity consistently and frequently without fanfare, whether the recipients are family, friends, or strangers. Cameron neither seeks attention for his actions, nor expects anything in return. This is who he is as a human being.

**1. Cameron's Dedication to and Lessons Learned from Scouting**

With his family's encouragement and support, Cameron joined the Boy Scouts Organization in first grade, when he became a Cub Scout. Ex. A, M. Collins Letter at 3. From the age of seven until he left home for college, Cameron dedicated significant time and energy to scouting. *Id*; *see also* PSR ¶¶ 87, 91. As a scout, Cameron embraced and embodied the Boy Scout motto: "Do a Good Turn Daily." Ex. A, M. Collins Letter at 3. He distinguished himself as a role model and example for others, becoming a leader and pillar of support in his troop. Ex. A, D. Wind Letter at 15. Cameron always took time to assist the younger boys in the troop – including the youngest Cub Scouts. Ex. A, R. Nowak Letter at 16; Ex. A, D. Wind Letter at 15; Ex. A, M. Collins Letter at 3.

Cameron displayed his selfless nature from a young age. As a Cub Scout, Cameron participated in the annual Pinewood Derby race, which required each scout to design and build a small pinewood car. Ex. A, D. Shine Letter at 5. Perhaps unsurprising given his knack for engineering, during one Derby, Cameron's pinewood car proved to be the fastest and won. *Id*. Cameron received a large trophy in recognition of his win. A close friend who Cameron has

known since his first day of grade school did not fare as well: his car came in dead last. *Id.* On

that friend's birthday later that year, Cameron gave his friend his prized Pinewood Derby trophy.

*Id.* But Cameron did more than that. Cameron vowed to help that friend build a better and faster

car to race at the next year's Derby. *Id.* There are few young boys who possess the generosity,

poise, and selflessness required to give away a hard earned, prized possession to a friend.

Cameron Collins was one.

As a young Cub Scout, Cameron set an ambitious goal: achieving the rank of Eagle Scout

– the most coveted and difficult rank in the Boy Scouts organization. Ex. A, D. Wind Letter at

15; Ex. A, K. Sullivan Letter at 17. Achieving the Eagle Scout rank is hard enough, but

Cameron challenged himself further with a self-imposed goal of becoming an Eagle Scout while

still very young. Ex. A, D. Wind Letter at 15. Cameron worked hard – earning various awards

and accolades, including the Arrow of Light award, the *Ad Altare Dei* Catholic scouting award

and nearly 40 merit badges on the road to Eagle Scout. Ex. A, M. Collins Letter at 3; Ex. D,

Staff, *Class act / An outstanding young Western New Yorker*, The Buffalo News (May 28, 2006).

Cameron also completed a capstone service project, the last step to achieving the rank of

Eagle Scout. Ex. A, R. Nowak Letter at 16. The Eagle Scout Service Project required Cameron

to plan and execute a project for the benefit of his community while demonstrating leadership

during the execution of the project. *See The Eagle Scout Rank*, Boy Scouts of America,

*available at* https://www.scouting.org/resources/guide-to-advancement/eagle-scout-rank/. The

planning included drafting a written proposal that had to be reviewed and approved by the local

and regional Boy Scout organizations. *Id.*

Cameron's project blended his love of the outdoors and his inherent desire to help others.

He identified a need for benches at a New York State nature preserve with walking trails.

Cameron also received approval from the park, and planned and executed the construction of ten wooden benches placed throughout that nature preserve. Ex. A, R. Nowak Letter at 16; PSR ¶ 87; Ex. D, *Class act / An outstanding young Western New Yorker*. Not just any wood would suffice, however, and Cameron researched high quality materials and sought and obtained donations of cedar and stain for the project. Ex. A, R. Nowak Letter at 16; Ex. D, *Class act / An outstanding young Western New Yorker*. To execute his Eagle Project, Cameron enlisted fifteen people to help him. Ex. A, R. Nowak Letter at 16. Cameron also included a local troop of Cub Scouts as part of his Eagle Scout Service project, both mentoring them and exposing the young scouts to the behind the scenes work involved in an Eagle Project. *Id*. After approximately 170 hours of his own time, Cameron completed his service project. *Id*. The Beaver Meadow Nature Center received ten newly constructed and stained wood benches for their nature trails and Cameron achieved the rank of Eagle Scout at the very young age of 13, the youngest in Western New York history. *Id*; PSR ¶ 87; Ex. D, *Class act / An outstanding young Western New Yorker*; *see also* Ex. E (pictures of benches).

Cameron's involvement with Boy Scouts did not end when he earned the Eagle Scout designation. To the contrary, Cameron stayed involved with scouting and continued to be a hardworking, dedicated leader and role model within his troop. Ex. A, R. Nowak Letter at 16; Ex. A, D. Wind Letter at 15. He earned additional merit badges and Eagle Palms, and assisted other scouts on their trail to Eagle Scout. Ex. A, R. Nowak Letter at 16; Ex. A, D. Wind Letter at 15; Ex. A, M. Collins Letter at 3.

### 2. Simple, Quiet Acts of Kindness and Inclusion Define Cameron's Character

Cameron's care for others in his community extends well beyond those affiliated with the Boy Scouts. Throughout his life, Cameron exhibited simple, quiet acts of kindness and

inclusion.  Cameron quietly identified individuals in need and reached out to them.  His actions

as a Scout reflected the way he treated others during grade school, high school, college, and as a

young adult.

### a.    Grade and High School

In grade school, Cameron proved himself to be a true, loyal, and thoughtful friend.  Ex.

A, Caitlin Collins Letter at 18; Ex. A, D. Shine Letter at 5.  Cameron acted generously, giving of

himself to ensure that those around him felt better.  Cameron also exhibited care and compassion

for others.  He identified, befriended, and helped those in need, including those with disabilities,

those who were victims of bullying, and those who were otherwise less fortunate than him.  PSR

¶ 87; Ex. A, M. Collins Letter at 2; Ex. A, K. Chevli Letter at 8.

For example, Cameron became a true friend and "adopted big brother" to ███████

███████████████████████████████████.  Ex. A, M. Collins Letter at 2.  Cameron often looked

out for ████ in difficult social situations and ████ adored Cameron for his kindness.  *Id.*  These

actions distinguished Cameron from his peers.  At Cameron's fourth grade graduation:

> [t]hey called Cameron to the podium where he was presented the
> CCC award for Courage, Commitment and Character. The
> principal went on to recount *numerous stories related to Cameron*
> *helping other children in need, when he thought no one was*
> *noticing*. The audience erupted with applause, and both Chris and I
> cried with emotion that our special boy was being honored for
> being such a caring young man.

*Id.* (emphasis added).

In addition, when Cameron's friend celebrated his bar mitzvah (the same friend Cameron

gave his winning Pinewood Derby trophy to), he asked Cameron to speak at the celebration in

recognition of their close friendship.  Ex. A, D. Shine Letter at 5.  Many teenagers (and adults)

balk at the thought of speaking to a room of 150 people, but Cameron knew this was an

important moment for a close friend.  *Id.*  Despite being only 13-years-old and of a different

faith, Cameron thoughtfully took the time to write and deliver a speech at a synagogue in honor of his friend reaching this important milestone. *Id.*

Cameron's humble, kind character is further evidenced by his actions at a fundraising lunch for the Erie County library association, held just prior to his freshman year of high school. Ex. A, C. Leary Letter at 20. A now-close friend attended the event with his mother, but knew no one else there. *Id.* That shy and reserved young man awkwardly stood out, visibly uncomfortable at the event. *Id.* Cameron, there with his family and several of his good friends, saw this young man standing uncomfortably alone. *Id.* Cameron approached this young man, and invited him to spend time with Cameron and his friends. *Id.* Cameron notices others, identifies when they are in need, and affirmatively helps them.

In high school, Cameron continued to be known as someone who was, quite simply, a good person. *Id.* Cameron always paid attention to those in need of a friend or kind word. Ex. A, M. Collins Letter at 2. He sought and took opportunities to uplift and assist those around him, and his actions spoke volumes. For example, Cameron frequently gave his time to help his classmates with their homework, often staying up late to do so – despite being done with his own assignments – to help teach others. Ex. A, C. Leary Letter at 20.

### b. College

Cameron embodied compassion, displayed kindness, and cared for others throughout college as well. Ex. A, J. Carey Letter at 12. He again gave his time, talents, and resources generously to his friends and classmates, consistently acting without regard to his own interests. Ex. A, F. Stransky Letter at 13-14.

As a freshman, Cameron organized an effort with his friends to re-establish an inactive fraternity at Villanova. Ex. A, F. Stransky Letter at 13; Ex. A, C. Carey Letter at 34. Cameron worked to ensure that the group was not simply a social organization. He organized several of

the fraternity's service projects, including fundraisers to benefit St. Jude's Children's Research Hospital and organizations supporting active military service members and veterans. Ex. A, C. Carey Letter at 34.

During college, ██████████████████████████████████████████████ ██████████████████████████████████. Ex. A, J. Carey Letter at 12; Ex. A, C. Carey Letter at 34. Cameron ████████████████████████████████. Ex. A, J. Carey Letter at 12. Separately, whenever this friend's family was in town visiting, Cameron always made a special effort to include the friend's much-younger brother, ensuring that he did not feel out of place. *Id.*

Cameron's compassion and care for others extended to strangers as well. *Id.* One Saturday night during college football season, while driving home after watching a game, Cameron noticed a young woman on the sidewalk. *Id.* The young woman was clearly in trouble and unable to care for herself. *Id.* Cameron did not know the young woman, but nevertheless stopped his car to assist. *Id.* Cameron helped her get to a safe location and arranged for someone to stay with the young woman until the following morning to watch over her. *Id.*

### 3. Volunteerism and Service to Others

In addition to his many quiet acts of kindness, compassion, and support for friends, family, and strangers throughout his life, Cameron actively seeks formal volunteer opportunities to serve the community in a more structured way. For example, Cameron channels his engineering skills into volunteer work with ████████████████, where he has contributed his time ██████████ for underprivileged community members in Collier County, Florida. PSR ¶ 91; Ex. A, L. Zarsky Letter at 22.

Cameron leveraged his passion for science into an internship at the ████████ ██████ during the summer between high school graduation and college. PSR ¶ 110. During the internship, Cameron continued to help others by mentoring young children and teaching them the physics behind Leonardo DaVinci's creations. Ex. A, C. Leary Letter at 20. Cameron's passion for the lessons earned him a "crowd favorite" title. *Id.* He also spent additional time with children (and adults!) struggling to understand the lesson, patiently working with the ██████ visitors. *Id.*

Following college graduation, Cameron worked at ████████████████. PSR ¶ 106. At ████, Cameron enthusiastically participated in the company's service days, in an effort to give back further to the community. *Id.* He participated in ████████████████ program, which empowers teachers, inspires students, removes barriers to graduation, and equips young people with the skills needed to succeed in the workplace. PSR ¶ 106; ████████████ ████████████████████████████. As a contributor to the ████████████████, Cameron educated young students about engineering as a career path. PSR ¶ 106.

Cameron's love of the environment and animals also guides his volunteer work. While on a vacation to New Zealand and Australia, Cameron and his fiancée dedicated a week of their time to ████████. PSR ¶ 105. During that week, Cameron and Lauren assisted in the rehabilitation of injured and recovering sea turtles. *Id.* Cameron's time at ████████ led him to look for ways he could help locally. He found an opportunity with ████████████ in New Jersey, where during the pendency of this case, Cameron quietly volunteered over 130 hours of his time. PSR ¶ 104. During his volunteer work at the ████████, Cameron educated visitors about the ████████ residents and conducted tours of the facility, including tours for

grade school class trips. *Id.* Cameron's volunteer work at the ███████ often also involved significantly less glamorous tasks. He enthusiastically fed the animals and cleaned the enclosures for ██████████████████████. *Id.*; Ex. A, L. Zarsky Letter at 23; Ex. A, C. O'Neill Letter at 25. Cameron happily "scrub[bed] the entire █████████████████████ and [came] out dripping in sweat with a huge smile on his face." Ex. A, L. Zarsky Letter at 23.

In addition to these structured volunteer efforts, Cameron quietly seeks other opportunities to help neighbors, friends, and his community. At the ███████, ██████████ home Cameron shares with Lauren, Cameron wakes before sunrise to walk their two dogs. Ex. A, L. Zarsky Letter at 21. One morning, Lauren observed Cameron on one of these walks from the window of their home, which is in a heavily trafficked tourist beach area. *Id.* at 22. Lauren watched Cameron as he carried a large garbage bag. *Id.* Cameron had no idea Lauren saw him. After Cameron returned home, Lauren asked about the bag. *Id.* Cameron explained that about a month before, he began collecting litter from the neighborhood while walking the dogs in the early morning. *Id.* In addition to being unsightly, Cameron feared that the trash would end up in the ocean, and he quietly tried to do his part while no one was watching. *Id.*

## C. Cameron's Relationship with Lauren Zarsky and Her Family

One of the most meaningful relationships in Cameron's life is the one he shares with his now-fiancée, Lauren Zarsky. Together for seven years, Cameron's love for Lauren also extends to her parents, Steve and Dorothy, her brother Brandon and his fiancée Chrissie, and Lauren's grandmother, Stella. Together with his parents, sister Caitlin, and older half-sister Carly, Lauren and the Zarskys are Cameron's family. PSR ¶¶ 86, 88.

### 1. The Beginning of Lauren's and Cameron's Relationship

Cameron and Lauren met during their freshman year of college at Villanova. PSR ¶ 88; Ex. A, L. Zarsky Letter at 21; Ex. A, D. Zarsky Letter at 26. Although Lauren never discussed

relationships with her family before, the day after meeting Cameron, Lauren told her mother about her encounter with him. Ex. A, L. Zarsky Letter at 26. Lauren felt that there was something different about Cameron from the moment they met. Ex. A, L. Zarsky Letter at 21; Ex. A, D. Zarsky Letter at 26. Lauren's friend Francesca also noticed something different about Lauren. Ex. A, F. Vignola Letter at 29. Francesca "had never heard [Lauren] speak about anyone the way she did about Cameron." *Id.* From the beginning, Cameron and Lauren were inseparable. They just connected. Seven years later, they are engaged to be married, and have weathered a significant test to their relationship, emerging even stronger.

### 2. Lauren's Family Embraces Cameron

When Lauren's parents met Cameron for the first time, they were immediately taken with Cameron's sincere and affectionate feelings for their daughter. Steven and Dorothy Zarsky were "extremely happy and relieved" to know that Lauren had met such a "kind-hearted young man." Ex. A, D. Zarsky Letter at 26. From the moment Lauren and Cameron began dating, the Zarskys welcomed Cameron into their family and observed Cameron treat Lauren "like gold." Ex. A, S. Ciborowski Letter at 31. Cameron is exceedingly honorable and loyal when it comes to Lauren, and always puts her first – caring for her needs and comfort ahead of his own. Ex. A, Caitlin Collins Letter at 18. For example, Cameron knows one of the most important people in Lauren's life is her 94-year-old grandmother, Stella. Ex. A, L. Zarsky Letter at 22. Lauren stresses and worries when she cannot reach her grandmother. *Id.* Cameron therefore installed motion sensors in Stella's apartment and configured them to send a notification when there has not been any movement during certain times of the day. *Id.* This provides peace of mind to Lauren and the Zarskys on Stella's whereabouts. *Id.* For all of these reasons, the Zarskys were elated when

Lauren and Cameron became engaged in the summer of 2017.  Ex. A, D. Zarsky Letter at 27; Ex. A, S. Ciborowski Letter at 31.

Cameron's affection for Lauren extends to her family as well, and he spends countless hours working on various projects at their home.  Cameron often repairs electronics for the Zarkys and assists with the general upkeep of their home.  Ex. A, D. Zarsky Letter at 26; Ex. A, B. Zarsky Letter at 32; Ex. A, S. Zablocki Letter at 33.  He installed motion detecting lights near their staircase to prevent one of them from accidently missing a step and getting hurt.  Ex. A, L. Zarsky Letter at 22.  After learning that ███████████████████████████████ ███████████████████████████████████, Cameron began traveling "far out of his way" to assist the Zarskys with any task that proved more dangerous as a result of ██████████████████████, including simple tasks such as cleaning the gutters on the family home.  Ex. A, D. Zarsky Letter at 26-27.

Cameron also diligently tends to Stella's needs.  For example, Stella's television often struggled to maintain a signal, which made watching her favorite programming challenging if not impossible.  Ex. A, L. Zarsky Letter at 22.  Cameron spent hours attempting to solve the signal issue, ultimately assembling and connecting a large antenna to Stella's roof to ensure that she could watch her favorite programs.  *Id.*  During a visit one stormy evening to Stella's home, the antenna acted up again.  *Id.*  Cameron braved the rain and storm, and climbed onto Stella's roof to fix the antenna signal so that Stella could watch her programming later that evening.  *Id.*  Cameron also orchestrated Stella's move to a smaller apartment from her family home, a "massive undertaking."  Ex. A, S. Ciborowski Letter at 31; Ex. A, L. Zarsky Letter at 22; Ex. A, D. Zarsky Letter at 27.  Cameron, Lauren, and other family members packed Stella's belongings.  Ex. A, L. Zarsky Letter at 22.  Cameron disassembled, moved, and reassembled Stella's

furniture, and configured Stella's new apartment with technological improvements. *Id*.
Cameron also gifted Stella furniture for her smaller apartment. *Id*. All of Cameron's assistance
provides a great deal of comfort to Stella.

There are other examples of Cameron's care for Lauren and her relatives, and his strong
sense of family, including:

- Regularly delivering groceries to Stella's apartment;

- Often cleaning Stella's apartment to spare her from "strenuous chores";

- Offering to photograph an engagement session for Lauren's brother and his
  fiancée; and

- Regularly shuttling Stella to and from church and social engagements.

Ex. A, C. O'Neill Letter at 25; Ex. A, B. Zarsky Letter at 32; Ex. A, S. Ciborowski Letter at 31.
Simply put, Cameron is an "uncommonly good person" who truly loves the Zarsky family as his
own. Ex. A, L. Zarsky Letter at 21.

### 3. Cameron's and Lauren's Future Plans

Cameron proposed to Lauren in the late summer of 2017. Ex. B, Cameron Collins Letter
at 2. Cameron and Lauren initially hoped for a 2019 wedding, but delayed their marriage
indefinitely pending the outcome of this case. *Id.*; Ex. A, M. Collins Letter at 3. Cameron and
Lauren remain devoted to one another. Lauren would like nothing more than to wed Cameron
and begin their married life together once this matter is resolved. PSR ¶ 88; Ex. A, L. Zarsky
Letter at 24.

## II.    RELEVANT SENTENCING CONSIDERATIONS

Cameron accepted responsibility for his actions and pled guilty to one count of conspiracy to commit securities fraud.  PSR ¶ 10.  Cameron and his co-defendants all pled guilty within days of each other.  PSR ¶¶ 10, 12-13.  Their acknowledgment of guilt avoided a potentially lengthy interlocutory appeal and a trial, and saved the Court and the government extensive resources that would otherwise have been expended.

Cameron's plea agreement contains an agreed-upon advisory Guidelines calculation of 37-46 months' imprisonment.  PSR ¶ 11.  However, while mathematically accurate, that advisory calculation is only one of many factors the Court must consider when fashioning an appropriate sentence.  *See Gall v. United States*, 552 U.S. 38, 49 (2007) (acknowledging that a court must consider the Guidelines as "the starting point and the initial benchmark," but that the advisory Guidelines range is "not the only consideration" in a court's determination of a sentence).  Moreover, the Guidelines are advisory only, they are not mandatory, they are not even presumptively reasonable, and they represent only one of a number of relevant considerations.  *See Nelson v. United States*, 555 U.S. 3520, 3502 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. . . . The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."); *Rita v. United States*, 551 U.S. 338, 367 (2007) (the Guidelines are "truly advisory").  An independent review of the factors set forth in 18 U.S.C. § 3553(a) should occur in each case as well, as the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."  *Id.* at 52; *see also Koon v. United States*, 518 U.S. 81, 113, 116 (1996).

Several of the factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a significant variance for Cameron. First, the advisory Guidelines place an unfair reliance on the avoided loss in the calculation of the range, especially in cases involving insider trading. *See* 18 U.S.C. § 3553(a)(1) (mandating that the sentence imposed must reflect the nature and circumstances of the offense). Second, the total avoided loss amount in this case is on the low end of the applicable Guidelines enhancement range. *See* U.S.S.G. § 2B1.1(b)(1); PSR ¶ 35. Third, Cameron's outstanding personal history and characteristics, including his history of volunteerism, young age, lack of experience trading, extremely low risk of recidivism, and genuine remorse, when weighed alongside the aberrant nature of the offense conduct, counsel in favor of a significant variance. *See* 18 U.S.C. § 3553(a)(1); *see also* PSR ¶¶ 133-34. Finally, a sentence of probation with a significant community service component and a financial penalty is "sufficient, but not greater than necessary" to provide just punishment and adequate deterrence, while avoiding unwanted sentencing disparities when the instant offense and Cameron's conduct is compared against (i) civil-only penalties imposed by the SEC for similar conduct, and (ii) other insider trading sentences both nation-wide and within the Southern District of New York. *See* 18 U.S.C. §§ 3553(a), (a)(2)(A), (a)(6).

As the Probation Department recognized, Cameron's many unique personal characteristics and good character, coupled with the out of character nature of his actions in this case and his extreme remorse, counsel in favor of a significant variance from the advisory Guidelines calculation. PSR ¶ 133, at 31. Probation concluded that a sentence of six months imprisonment, a $150,000 fine, plus one year of supervised release with a 200 hour community

service component was warranted. *Id.* at 29-31.[2] While we very much appreciate the thoughtful, careful analysis by, and hard work of, the Probation Department in reaching its recommendation, we respectfully request that the Court, after consideration of the Section 3553(a) factors, sentence Cameron to a non-custodial term of probation with a significant community service requirement and financial penalty. Such a sentence is "sufficient, but not greater than necessary," appropriately reflects the seriousness of the offense, and accounts for Cameron's good character and acts. 18 U.S.C. § 3553(a).

### A.      The Offense Conduct and Plea Agreement

#### 1.      The Offense Conduct

Upon the return of the original indictment, Cameron voluntarily surrendered to the Court on August 8, 2018. PSR at 2. Cameron complied with all conditions of release during the pendency of this case. *Id.* at 34. Following significant motion practice resulting in the return of more narrowly tailored Superseding Indictment on August 6, 2019, Cameron pled guilty to one count of conspiracy to commit securities fraud on October 3, 2019. *Id.* ¶¶ 1, 10.

In his allocution and statement to the Probation Department, Cameron admitted that over a few days in late June 2017, he agreed with his father and others to sell shares of Innate based on material, nonpublic information Cameron received from his father regarding the failed trial results of Innate's key developmental drug. *See generally* PSR ¶¶ 50-66. Cameron explained that he understood his father, who was very emotional at the time he called Cameron, owed a duty to Innate to keep the trial results information confidential. Plea Proceeding Tr. at 18:16-18 (Oct. 3, 2019), ECF No. 129; PSR ¶¶ 54-55. Cameron described his father as "shattered" during

---

[2]On page 33 of the Report, the "Special Conditions" section refers to 200 hours of community service for each of the *two* years of supervised release. We assume this is a typographical error given the recommendation on page 31.

this initial discussion, which was the first time Cameron heard his father this way.  PSR ¶ 54.

Cameron and his father agreed on that call that Cameron would sell a portion of shares if

possible.  *Id.* ¶ 55.

Cameron previously recommended Innate to the Zarskys and another friend, and he knew

that they invested in the stock.  *Id.* ¶ 52.  As a result of the failed trial results and expected

negative impact on Innate's share price once the news became public, the Zarskys were about to

suffer a significant financial loss.  *Id.* ¶ 57.  Cameron believed that they could not afford this

loss.  *Id.* ¶¶ 57-58.  In addition, at this time, unbeknownst to Lauren or the Zarskys, Cameron

planned for his later proposal to Lauren.  *Id.* ¶ 59.  Although very misguided, Cameron's

motivation to tell the Zarskys about the failed trial results was to protect them (and Lauren) from

loss of their retirement savings and because he feared losing Lauren.  *Id*. ¶ 59.  The feeling of

guilt also motivated Cameron to inform the friend to whom he recommended Innate, whose

mother suffered from the disease Innate's development drug hoped to cure, about the failed trial

results.  *Id.* ¶ 63.  Cameron also sold a portion of his own shares prior to the public

announcement of the failed trial results.  *Id.* ¶ 64.  Nearly a year later, when agents with the

Federal Bureau of Investigation executed a search warrant at Cameron and Lauren's home in the

early morning, Cameron compounded his earlier mistake by failing to tell the FBI agents the

truth about his knowledge of the confidential trial results and the Zarsky's Innate holdings.  *Id*. ¶

66.

Driven by impulse, fear, concern for others, and experiencing a terrible lapse in judgment

when he made these decisions, Cameron will forever regret and pay for his actions.

### 2. The Plea Agreement

Pursuant to Cameron's Plea Agreement with the government, and as calculated in the PSR, the parties agree that the advisory Guidelines range is 37 to 46 months' imprisonment and the applicable fine range is $15,000 to $150,000. *Id.* ¶ 11.

In calculating the advisory Guidelines range, the parties stipulated to a base offense level of 8 pursuant to U.S.S.G. § 2B1.4. *Id.* The base offense level is increased 14 levels because the loss avoided in the conspiracy involved more than $550,000 but less than $1,500,000, specifically $768,520. *Id.* The parties also agreed that a two-level enhancement for obstruction of justice applied pursuant to U.S.S.G. § 3C1.1 due to Cameron's failure to tell the FBI agents the truth during their April 2018 interview of him. *Id.* Finally, the parties agreed that a three level reduction is warranted for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b). *Id.* The resulting advisory Guidelines offense level is 21 and Cameron's lack of a prior criminal history places him within Criminal History Category I, resulting in the advisory Guidelines range of 37 to 46 months' imprisonment. *Id.* The parties further stipulated that although no departures to the Guidelines are warranted, either party may seek a sentence outside of the stipulated advisory range based upon the factors contained in 18 U.S.C. § 3553(a). *See* Plea Agreement at 2-3 (Sept. 20, 2019).

### B. The Section 3553(a) Factors

Title 18, United States Code, Section 3553(a) represents "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall*, 552 U.S. at 50 & n.6 (citation omitted). The Court must consider each of those factors in fashioning a sentence that is "sufficient, but not greater than necessary" to comply with those statutory objectives. 18 U.S.C. § 3553(a). Those factors include the history and characteristics of a defendant, the nature and circumstances of the offense, the need for the

sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. §§ 3553(a)(1), (2)(A). They also include the need for the sentence to afford adequate deterrence and to consider the public's need for protection from future crimes. 18 U.S.C. § 3553(a)(2)(B)-(C).[3] Section 3553(a) further requires the Court to consider the kinds of sentences available and Guidelines range applicable to the defendant ((a)(3) and (4)), and any pertinent policy statement issued by the Sentencing Commission ((a)(5)). The factors also emphasize the need to avoid unwarranted sentencing disparities among defendants with similar records ((a)(6)).

When weighed and analyzed, each of the above factors combined counsel in favor of a sentence of probation with a significant community service component and financial penalty.

### 1. The Guidelines Enhancement Associated with Gain or Loss Is Not a Fair Measure of the Offense Conduct in this Case

In financial fraud cases, the Guidelines' overemphasis on gain or avoided losses often results in skewed sentencing ranges not truly reflective of the offense conduct. This is especially true in cases involving insider trading, where an enhancement attempting to capture an avoided loss or personal gain is an inadequate measure of both a defendant's culpability and the seriousness of the offense in the absence of an identifiable victim.

---

[3] We respectfully submit that the factors set forth in 18 U.S.C. § 3553(a)(2)(D) are inapplicable to Cameron's sentencing determination, as there is no need here for educational or vocational training, medical care, or other correctional treatment. Likewise, as the government is not seeking restitution, the Court need not consider the factor set forth in 18 U.S.C. § 3553(a)(7) ("the need to provide restitution to any victims of the offense"). We note again, however, that Cameron previously disgorged all of his avoided losses (plus interest) in the parallel SEC civil case. PSR at 31.

### a.  Courts and Legal Scholars Acknowledge the Severity of the Gain/Loss Avoided Guidelines Enhancement

The Guidelines enhancements capturing "gain" or "loss" in financial fraud cases have long been criticized, as they lead to unreasonably high sentencing ranges.  Such significant weight placed on this single, isolated aspect of the offense results in an "inordinate emphasis" on "putatively measurable quantities such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight" to that factor.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006).  Put another way, the Guidelines' use of the loss enhancement metric does not result "from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 U.S. Dist. LEXIS 71257, at *11-12 (E.D.N.Y. Apr. 27, 2018); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (recognizing that the Guidelines' emphasis on gain or loss "effectively ignores the statutory requirements that federal sentencing take many factors into account").

In recognition of this, courts often vary from the proscribed advisory Guidelines ranges. One of the main reasons for doing so is the underlying belief that the Guidelines systematically generate recommendations judges consider "disproportionately harsh" because "intended loss is a fatally flawed proxy for culpability."  Daniel S. Guarnera, *A Fatally Flawed Proxy: The Role of "Intended Loss" in the U.S. Sentencing Guidelines for Fraud*, 81 Mo. L. Rev. 715, 719 (Summer, 2016).  The Department of Justice previously recognized this phenomenon when it wrote to the United States Sentencing Commission and noted that there are "certain offense types for which the guidelines have lost the respect of a large number of judges."  Ex. F, June 28, 2010 Letter from Jonathan Wroblewski, Director, Office of Policy and Legislation, to William K.

Sessions, Chair of the Sentencing Commission. Those offenses included "certain frauds involving high loss amounts." *Id.*

Further, a mechanical, mathematic approach to sentencing has the effect of treating as equivalent defendants whose conduct is vastly different in terms of culpability and harm to others. Judge Rakoff recognized this paradox when sentencing a defendant for involvement in a political bribery scheme:

> The guidelines, for example, seem to be of the view that if some swindler, such as one that I once prosecuted many years ago, swindles, in that case I'm thinking of, three widows out of every last penny they have been left by their late husbands, but the total amount he obtains is only a few hundred thousand dollars, he should be given under the guidelines a much lower sentence than someone who commits, say, an accounting fraud that cheats every shareholder in a company out of 50 cents but because there are a million shareholders amounts to a much greater loss. This is a morally repugnant view of sentencing that this Court will not give more than the modest efforts it is due.

Ex. G, Sentencing Tr. at 4:5-16, *United States v. Rosen*, No. 1:11-cr-00300-JSR-1 (S.D.N.Y. May 7, 2012).[4]

In November 2014, an ABA Task Force including practicing attorneys, academics, and jurists – individuals deeply familiar with the federal sentencing system – proposed significant changes to the financial crimes Guidelines. The Task Force suggested that the Guidelines consider various culpability factors as an alternative to the near-exclusive focus on loss or gain. *See generally A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014), *available at* https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf (citing factors such as the defendant's motive, and the sophistication and duration of the offense

---

[4] Where we cited to a sentencing transcript, we have attached as an exhibit the relevant excerpt, rather than the complete transcript.

for consideration when evaluating a defendant's culpability). The Task Force further noted that probation is generally appropriate in cases where "the defendant has no criminal history points, and where the circumstances of the offense support a finding that the offense was not 'otherwise serious,'" within the meaning of 28 U.S.C. § 994(j). *Id.* at 7. Importantly, this latter point was taken directly from the Sentencing Reform Act, which originally authorized the Sentencing Commission to promulgate guidelines, and which tasked the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C.A. § 994(j) (West).[5]

In 2015, in response to heavy criticism of the Guidelines scheme for financial cases, the United States Sentencing Commission adopted limited amendments to the Guidelines, including an increase to the amount of the gain or loss associated with certain offense levels. U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* (Apr. 30, 2015), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf. While an important step in the right direction, the Commission's actions and corresponding amendments did not adopt the ABA Task Force's

---

[5] As noted by (now former) Judge Gleeson, the Guidelines miss the mark in this regard. In *United States v. Leitch*, Judge Gleeson cited Professor Kate Stith's and Judge José A. Cabranes's observations from fifteen years prior, namely, that "[w]hile before the Guidelines nearly 50 percent of federal defendants were sentenced to probation alone, that figure is now less than 15 percent." No. 11-CR-00039 (JG), 2013 WL 753445, at *1 (E.D.N.Y. Feb. 28, 2013). He observed further that as of February 2013, "the Commission reported that that figure is now less than six percent." *Id.*

recommendations or address the core concern of the criticism: that the driving force for sentencing ranges in fraud cases continued to be the adherence to the gain and loss financial tables. *See* Mark W. Bennett *et al.*, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 984, 989 (Mar. 2017) (criticizing the amendments for lack of action on the loss tables and advocating for a loss guideline that is empirically based).

Courts, however, have relied on the ABA Task Force's analysis where the advisory Guidelines sentence is out of step with a more comprehensive view of the offense conduct. *See, e.g.*, Ex. H, Sentencing Tr. at 23:13-24:1, *United States v. Faibish*, No. 1:12-cr-00265-ENV-1 (E.D.N.Y. Mar. 10, 2016). Here too, the advisory Guidelines range, while mathematically accurate, places too much weight on the "loss avoided" by Cameron and others who traded, and does not provide a holistic view of the offense conduct.

### b. Relying Solely on the Gain (Loss Avoided) Enhancement is Unjust in Insider Trading Cases

For insider trading cases in particular, the Guidelines' utilization of gain or loss avoided "resulting from the offense" (U.S.S.G. §§ 2B1.4, 2B1.1) leads to unjust results. Whatever one may conclude about the impact on the owner of the material nonpublic information or the integrity of the markets caused by insider trading, the use of the dollar amount of gain (or loss avoided) is, at best, a proxy for harm that is very difficult to measure. *See* U.S.S.G. § 2B1.4 cmt. background (positing that the gain calculation is used in insider trading cases because "the victims and their losses are difficult if not impossible to identify"). Because victims are so difficult to identify in insider trading cases, due in part to the subjective nature of trading decisions and strategies, the Guidelines' use of the fraud table frequently leads to unjust sentencing ranges for insider trading defendants.

As part of the Court's sentencing opinion in *United States v. Gupta*, Judge Rakoff observed that the Sentencing Commission's calculation of an advisory Guidelines range was "more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology – thus maximizing the risk of injustice." 904 F. Supp. 2d at 351. Judge Rakoff further reflected that the Guidelines' focus on the gain/loss amount – a factor that is integral "to some frauds" – was merely "incidental to others," including the long-running insider trading offense for which Mr. Gupta, a former member of the Board of Directors of Goldman Sachs, was convicted. *Id.*

Cameron's conduct was illegal. However, in his case the advisory Guidelines' emphasis on the overall loss avoided amount is a poor barometer for the type of sentence he should receive.

c. **The Total Loss Avoided for the Conspiracy of $768,520 is on the Low End of the Applicable Guidelines Enhancement Reflecting a Loss/Gain Amount from $550,000-$1,500,000**

The inability of the gain/loss enhancement to inform a holistic view of culpability and offense conduct is further highlighted in this case given the broad range of the applicable enhancement. Courts acknowledge this issue, observing that such sentences are "based on a table that groups together losses in a very wide range," rather than using a more "precise calculation of loss." *United States v. Binday*, 804 F.3d 558, 598 n.44 (2d Cir. 2015). Here, the loss avoided amount combines the proceeds of trading for all family and friends involved, totaling approximately $768,520. PSR ¶ 35. Cameron's trading accounts for $571,000 of that amount. *Id.* These loss amounts fall within a nearly $1 million range of greater than $550,000 and less than $1,500,000 and correspond to a 14 level increase. *See* U.S.S.G. § 2B1.1(b)(1).

For the purpose of assessing the economic impact of the offense, the Guidelines therefore treat defendants who gain a profit or avoid a loss of $1,499,999 *identically* to someone who gained a profit or avoided a loss almost two-thirds less than that, but whose offense level happens to be above $550,000. Accordingly, Cameron's guidelines enhancement, with his personal loss avoided of $571,000, and the total loss avoided for those who traded of $768,520, is the same as someone convicted of avoiding losses almost double that of Cameron's avoided loss calculation. This unfairly groups Cameron with defendants responsible for far more significant economic impact. We respectfully submit that this is an important distinguishing factor weighing in Cameron's favor.

## 2.      Cameron's Life and Character Counsel in Favor of Probation

A key statutory factor requires sentencing courts to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). In assessing this factor and the individual person to be sentenced, it is important to recognize that:

> [I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant.

*Adelson*, 441 F. Supp. 2d at 513-14 (internal quotation marks and citation omitted). Similarly, as noted by Judge Sullivan during a post-trial sentencing:

> Those factors include, as we have discussed in great detail, the facts and circumstances of the life of the individual. I am imposing a sentence on an individual who is unique, with a unique combination of experiences, decisions, just accidents of life, of good judgments, bad judgments, a lifetime worth of judgments. And so naturally that is the starting point for any sentence.

Ex. I, Sentencing Tr. at 52:1-7, *United States v. Contorinis*, No. 1:09-cr-01083-RJS-1 (S.D.N.Y. Dec. 17, 2010).

In evaluating Cameron's personal history and characteristics, the Probation Department acknowledged that not one, but *several*, aspects of Cameron's life counsel in favor of a variance: the law abiding life he has led, his profound commitment to volunteerism and service, his extreme remorse and acceptance of responsibility, his young age, and the truly aberrant nature of this conduct by an otherwise good and decent person.  PSR ¶ 133, at 30-31.  These qualities, when considered as a whole and weighed against the offense conduct, counsel in favor of the requested sentence for Cameron.

> **a.     Cameron's Quiet Acts of Kindness and History of Service and Volunteerism Speak to His True Character**

Courts recognize that where a defendant's offending conduct is dramatically at odds with his life record and outstanding character, the defendant can be deserving of a sentence substantially below the advisory Guidelines range.  *See Gupta*, 904 F. Supp. 2d at 353-54 (noting that a defendant's charitable contributions and selfless devotion to socially beneficial activities stood in stark contrast to his crime and favored leniency).  This is especially true, where, as here, the defendant both before and after the offense conduct devoted significant time to volunteerism and charitable work.  *Id*.

Letter after letter submitted on behalf of Cameron attests to his outstanding character, commitment to public service, volunteerism, and unusually humble and kind nature.  Cameron is an exceptional young man.  *See generally* Ex. A; Section I, *supra*.  He is a uniquely kind, selfless, and generous person.  He wants nothing more than to improve life for those around him- both loved ones and strangers.  He serves and assists without thought of or need for public

recognition or acclaim.  And, unlike many other defendants whose kind, charitable acts previously garnered significant variances at sentencing, Cameron established his exemplary record in far fewer years given his young age.

Doing good is simply part of Cameron's nature.  His simple and kind acts, generous spirit, and commitment to his community over his twenty-seven year life speak volumes to who Cameron truly is.  Courts have recognized similar, if not lesser, good works and good character with significant variances.  In *United States v. Holzer*, a 34-year-old former attorney pled guilty to insider trading related conduct, which was done while the defendant was an active member of the bar.  *See* Ex. J, Sentencing Tr. at 17:11-12, *United States v. Holzer*, No. 1:09-cr-00470-VM-1 (S.D.N.Y. Sept. 29, 2009).  Although the defendant had a stipulated Guidelines range of 12 to 18 months, the Court agreed with the characterization of Mr. Holzer as a "good person who made a terrible mistake," and cited his "commendable community service and his *pro bono* work with various not-for profit organizations" as the key reasons for varying from the proscribed range and imposing a non-custodial sentence.[6]  *Id*. at 17:1-6, 18:3.

In *United States v. Peterson*, the Court deviated from the advisory Guidelines range of 12 to 18 months, imposing a sentence of two years of probation and three months of home confinement.  Ex. K, Sentencing Tr. at 17:23, 21:7-9, *United States v. Peterson*, No. 1:11-cr-00665-RPP-1 (S.D.N.Y. Oct. 11, 2011).  In doing so, the Court reasoned:

---

[6] Several of the referenced variances and imposed sentences involve advisory Guidelines ranges lower than that proscribed for Cameron.  This once again demonstrates that the gain or loss avoided amount alone is not a good metric for the offense conduct.  Certain aggravating factors are present in the referenced cases in which the defendant received significant variances, such as the commission of the offense by a licensed or industry professional, the offense involving multiple stocks, and the offense occurring over a prolonged period of time, among others.  None of these factors are present here; therefore, the higher advisory Guidelines range for Cameron should not preclude a variance resulting in a sentence similar to or below those referenced.

I'm making that determination based on the content of the presentence report, which shows that he engaged in a number of civic activities not as a figurehead, but as a participant, a person who gave of himself, not just of his wallet, and engaged in community activities to help his community. And that's significant.

*Id*. at 19:4-9. *See also* Ex. L, Sentencing Tr. at 20:23-25; 23:4-6; 36:1-3, *United States v. Joseph Collins*, No. 1:07-cr-01170-LAP-1 (S.D.N.Y. July 15, 2013) (recognizing that with the exception of the defendant's involvement in the securities fraud scheme, "every spare moment of his life has been filled with service to his family, his country, his church, his schools, and other deserving organizations" and departing significantly from the 95 years to life range to impose a sentence of one year and a day).

Similar to these defendants and in some ways more impressive than them, Cameron built a life record that warrants a significant variance beyond that recommended by Probation. From a very young age, Cameron "volunteer[ed] in the community" and "help[ed] others." PSR at 30. He looked for formal and informal opportunities to do so, including through his involvement with the Boy Scouts and charitable organizations such as ▮▮▮▮▮▮▮▮. PSR ¶¶ 87, 91, 104-105. Throughout his life, Cameron served "the community and buil[t] lasting and strong friendships and relationships." PSR at 30. Cameron is a good young man who made a terrible mistake, but he has been an otherwise law-abiding citizen and "a commendable individual in the community." PSR at 31.

Additionally, Cameron quietly gives of his time and resources without fanfare and without regard to selfish interests. When good work is done for the benefit of others, and not to "gain status" or "enhance image," that makes such work all the more extraordinary and worthy of recognition. *See Adelson*, 441 F. Supp. 2d at 513 ("[The defendant's] good deeds were not performed to gain status or enhance his image. Most of them were unknown to all but a few

people until the time of sentencing.") (citation omitted). Cameron never sought recognition for his good works or kindness – it was and is simply the way he chooses to live his life. Whether he volunteers his time to help ready a youth center at a local church, repair appliances and build furniture for family and friends, assist an elderly neighbor, or clean and repair a broken water heater and flooded dryer vent for a friend, Cameron seeks no thanks or recognition. Ex. A, D. Zarsky Letter at 26-28; Ex. A, L. Zarsky Letter at 23; Ex. A, F. Vignola Letter at 30. He just likes to help. As captured in Probation's Report, Cameron "is a great example of generosity and selflessness." PSR ¶ 92 (discussing interview with Cameron's mother). "Cameron will drop whatever he is doing to lend a helping hand, and his help is of the highest caliber." Ex. A, Caitlin Collins Letter at 18. Cameron views "problems as opportunities to make a positive contribution," and his kindhearted spirit and worldview inspire those around him to be better people. Ex. A, L. Zarsky Letter at 23.

### 3. The Nature and Circumstances of the Offense Counsel in Favor of Probation

Just as the Court is to consider the individual characteristics of a defendant, the Court must also evaluate the nature and circumstances of the offense and weigh them against the other Section 3553(a) factors. Cameron's actions in this case are atypical of those in many insider trading prosecutions. Cameron is not a licensed professional or industry insider. He did not participate in a long-running scheme or act for reputational prowess, but out of fear and concern for his family and loved ones. The trading activity was extremely limited in scope. The offense involved only a single security and lasted only days. Gov't Opp'n to Defs.' Pretrial Mots. at 8 (Mar. 8, 2019), ECF No. 69. These differences from many insider trading prosecutions weigh in favor of a significant variance.

### a. Cameron is a Young and Inexperienced Industry Outsider

As a preliminary matter, Cameron is different from many insider trading defendants. He is neither a financial industry licensed professional, nor lawyer or other corporate insider (i.e., gatekeeper) who misappropriated client information for personal gain or professional advancement. At the time of the trades, Cameron was a young engineer who initially invested in Innate stock via his father when he was only 12-years-old. PSR ¶¶ 51, 134. These factors counsel in favor of leniency.

As a point of contrast, courts have treated the sophistication of the defendant as an aggravating factor that weighs *against* a more lenient sentence. In *United States v. McClatchey*, the defendant had access to information about mergers and acquisitions contemplated by the bank he worked for as a director. Ex. M, Sentencing Tr. at 14:19-15:4, *United States v. McClatchey*, No. 1:16-cr-00369-KPF-2 (S.D.N.Y. Jan. 11, 2017). On approximately a dozen occasions over a period of 19 months, McClatchey shared nonpublic information related to prospective mergers with a friend. *Id*. at 15:14-17. That friend traded on the information and profited, providing McClatchey with cash and free professional services in exchange. Information, ¶¶ 26-27, *United States v. McClatchey*, No. 1:16-cr-00369-KPF-2 (S.D.N.Y. July 12, 2016). Because this conduct amounted to an "extraordinary abuse of [the] trust" placed in him by his employer, the court determined that a period of incarceration was important. Ex. M, Sentencing Tr. at 33:19-20, 34:19-20. Even with those aggravating factors, which are not present in Cameron's case, McClatchey received a sentence of only five months' imprisonment. *Id*. at 34:19-21.

### b. Cameron's Conduct Was Motivated Out of Fear and Concern for Others

Additionally, this is not a case in which Cameron planned to engage in insider trading. There was no premeditation, no pattern of misconduct, and no payment for information. The disclosure of the confidential trial results information came after Cameron's father received shocking, unexpected news – news that triggered an emotional response and "a moment of weakness." PSR at 31. Cameron did not trade and did not share the information with the Zarskys and his friend as part of a premeditated scheme. He acted impulsively and sought to avoid a loss and to have the Zarskys and his friend similarly avoid losses. Notably, Cameron only sold a *portion* of his Innate holdings prior to the public announcement of the failed drug trial results. PSR ¶¶ 34, 64.

Even in cases involving an industry professional's greed and desire to maximize profits or reputational benefits from inside information over an extended period, however, courts have varied significantly downward when sentencing. For example, in *United States v. Hobson*, an investment advisor received material nonpublic information from a childhood friend who worked at a pharmaceutical company. Hobson used this information to trade for his own and his clients' benefit. At sentencing, Judge Swain noted that the defendant was a competent professional who "knowingly violated the law out of *greed, for profits*, for a prolonged period of time." Ex. N, Sentencing Tr. at 22:17-19, *United States v. Hobson*, No. 1:16-cr-00351-LTS-2 (S.D.N.Y. Mar. 15, 2017) (emphasis added). Even with a motivation of greed, an industry professional's background, and a scheme that extended over a prolonged period, the Court varied significantly from the guidelines range of 24 to 30 months, and sentenced Hobson to six months' imprisonment. *Id.* at 20:6-7, 24:12-14. Hobson's sentence for a prolonged scheme by an industry insider motivated by a desire to maximize profits should not be the same as Cameron's

for an event involving trading by an inexperienced young man in a single security to avoid losses over a few days.

Judge Kaplan – in sentencing a defendant convicted following trial to 12 months' imprisonment for passing along confidential information related to internal decision making at the Centers for Medicare & Medicaid Services – observed that the defendant's misconduct was "bold" and "unapologetic" at a sentencing hearing. Ex. O, Sentencing Tr. at 62:17-18, *United States v. Blaszczak*, No. 1:17-cr-00357-LAK-1 (S.D.N.Y. Sept. 13, 2018). Blaszczak "got paid for digging out the inside information by trading on his relationships, and he got paid to be the cut out." *Id.* at 63:1-4. Again, despite these significant aggravating factors, Judge Kaplan sentenced the defendant to 12 months' imprisonment, well below the Guidelines range of 63 to 78 months. *Id.* at 23:2, 72:7-8.

Cameron is unlike such defendants. His misconduct was "the result of his strong sense of family, and albeit misguided, desire to protect the people he cared for, which in turn blurred his judgment." Ex. A, B. Zarsky Letter at 32. Cameron's "motivation to become involved in the offense was to avoid a large financial loss to himself and to his fiancée's family members." PSR at 31. In doing so, Cameron exhibited "a moment of weakness and executed bad judgment." *Id.* While there is no excuse for his behavior, and Cameron takes full responsibility for his actions, this crime is a far cry from the many insider trading cases in which defendants involved in long-running schemes are motivated purely by a desire to maximize profits or the deep seeded need to establish and distinguish a name for oneself within an industry.

### c. Cameron's Conduct Occurred Over a Short Period of Time and Involved One Security

Finally, Cameron's conduct involved a *single* security that he and a few others traded over an extremely limited period of time. *See generally* PSR ¶¶ 27-33. As the Government itself

acknowledged, "[t]his case, by any objective measure, is relatively straightforward. It [was] a *one-event*, *one-stock*, three-defendant scheme that took place over *five days*." Gov't Opp'n to Defs.' Pretrial Mots. at 8 (Mar. 8, 2019), ECF No. 69 (emphasis added).

The limited scope of Cameron's conduct stands in stark contrast to the duration and scope of trading in other recent insider trading cases, which the Government and courts in this District acknowledged to be aggravating factors.

For instance, Benjamin Chow, who was convicted at trial, co-founded and worked as a partner at Canyon Bridge Capital Partners, a private equity firm. On numerous occasions over the course of a seventeen month period in 2016 and 2017, Chow provided a friend and business associate with material, nonpublic information related to a prospective merger. Gov't Sentencing Mem. at 16, *United States v. Chow*, No. 1:17-cr-00667-GHW-1 (S.D.N.Y. Nov. 20, 2018), ECF No. 148. That friend parlayed the material, nonpublic information into more than five million dollars in profitable trades. *Id*. at 4. Chow received a sentence of three months' imprisonment and nine months' home confinement, despite an advisory Guidelines Range of 78 to 97 months. Judgment at 3, *United States v. Chow*, No. 1:17-cr-00667-GHW-1 (S.D.N.Y. Jan. 29, 2019), ECF No. 152.

Similarly, Jhonatan Zoquier was involved in an insider trading scheme that lasted over one year. Ex. P, U.S. Dep't of Justice Press Release, *Five Individuals Charged With Participating in Three Insider Trading Schemes Generating More Than $5 Million in Profits on Inside Information Misappropriated From An Investment Bank* (Aug. 16, 2017). Together with two additional overlapping schemes that involved several other defendants, Zoquier and his coconspirators traded "over 50 times in advance of confidential corporate information." *Id*. (emphasis added). Specifically, Zoquier and his co-defendants traded on stolen confidential

information related to several prospective mergers and acquisitions.  *Id.*  Zoquier received a

sentence of three months' imprisonment, but faced a Guidelines Range of 12 to 18 months.

Ex. Q, Sentencing Tr. at 5:9-10, 25:3-5, *United States v. Zoquier*, No. 1:17-cr-00503-AJN-4

(S.D.N.Y. Mar. 6, 2019).

The scope of unlawful trading in Cameron's case is far narrower in many key respects –

such as scheme duration and number of securities – than the unlawful trading in nearly all other

recent insider trading cases, including those where the defendants received sentences that were

significantly below their respective advisory Guidelines range and, in some cases, below that

recommended for Cameron.  The nature and circumstances of Cameron's offense therefore

warrants a significant variance to his advisory Guidelines range as well, one that is below those

received by the individuals noted above with significant aggravating factors.

> **4.      A Non-Custodial Sentence of Probation Coupled with Community Service and a Significant Fine Provides Sufficient Deterrence and Just Punishment**

The requested non-custodial sentence of probation, conditioned upon a rigorous program

of community service, and coupled with a significant fine, vindicates the goals of sentencing

codified at Section 3553(a)(2) – namely, imposition of a sentence that provides for both specific

and general deterrence, and that provides "just punishment."  *Gall*, 552 U.S. at 50 & n.6.  No

period of incarceration is necessary to deter Cameron from committing any future crime, nor is it

necessary to serve the purpose of general deterrence.  Cameron has faced – and for the rest of his

life will continue to face – collateral consequences that serve the statutory goals of sentencing.

Moreover, given Cameron's background and the unique circumstances that led to his

misconduct, incarceration is not necessary to protect the public or to serve as a general deterrent

to others.  A sentence of probation paired with community service is also a punitive measure that

adequately punishes Cameron for his misconduct.

### a. A Non-Custodial Sentence of Probation and Community Service Provides Adequate Specific and General Deterrence

Cameron already faces severe penalties and consequences as a result of his misconduct. He will forever be a felon. He has lost multiple civil rights. He has been enjoined and disgorged his avoided losses with prejudgment interest, totaling $634,299, in the parallel SEC action. PSR ¶ 115. The very public nature of this case guarantees that Cameron's reputation will be forever indelibly linked to his lapses in judgment. *See* Ex. R, Sentencing Tr. at 54:3-6, *United States v. Gupta*, No. 1:11-cr-00907-JSR-1 (S.D.N.Y. Oct. 24, 2012) ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, Mr. Gupta is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result.").

Perhaps of more consequence to him and to further underscore that no additional specific deterrence is necessary, Cameron's misconduct resulted in disruption to his future plans (including the postponement of his wedding), and great emotional trauma to his family and loved ones. This, too, is sufficient to dissuade Cameron from any future misconduct. His mother is "devastat[ed]" by the situation, and cries herself to sleep each night. Ex. A, M. Collins Letter at 3. His fiancée, an accountant by training and education, had her CPA license suspended as a result of his poor decisions and "endured the greatest hardship of [her] life." Ex. A, L. Zarsky Letter at 24; Ex. B, Cameron Collins Letter at 1; Ex. S, *In the Matter of Lauren Zarsky, CPA*, SEC Order Instituting Public Administration Proceedings (Aug. 15, 2018). Similarly, as Cameron's future mother-in-law writes:

> We've all been living in such horror and limbo not knowing what the future holds. Throughout my life I've dealt with and witnessed a great deal of hardship amongst family members and friends, however, I've never been as deeply affected by any situation more than the one that Cameron faces now. It causes me great physical and mental torment to see someone who is so giving and so young be permanently scarred by a single incident.

Ex. A, D. Zarsky Letter at 28.

Finally, because Cameron is neither a financial industry professional nor a frequent stock trader, there is no risk that he will engage in a similar offense (or any offense) in the future. Moreover, there would be no opportunity for Cameron to engage in similar conduct as neither his father nor other family members continue to hold positions of trust at publicly traded companies. Accordingly, there is no unfulfilled need to protect the public from potential future economic crimes by him. *See, e.g.*, *United States v. Burnell*, 367 F. Supp. 3d 12, 16 (E.D.N.Y. 2019) (finding that the defendant posed a low risk of recidivism in part because he was "no longer operating the business involved in the instant offense"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (finding the risk of recidivism eradicated by the fact that the offenses at issue were "particularly adapted to [the defendant's] chosen career," "[t]hat career is over, and his potential to commit this particular type of crime has been eliminated").

Additionally, a period of incarceration is not necessary to serve as a general deterrent to others. Cameron is an electrical engineer by training. He is not a financial industry professional and does not live in the world of the stock market. *See* PSR ¶¶ 64, 101. To the contrary, at the time of the offense he was only 24-years-old and made many of his financial decisions and investments in consultation with his father. *See* PSR ¶¶ 54-55. Anyone similarly situated to Cameron would surely be deterred by the many individual setbacks and consequences that Cameron has faced as a result of his behavior.

Accordingly, for the reasons stated above, incarceration is not necessary to achieve the dual goals of specific and general deterrence. Rather, the proposed non-custodial sentence, coupled with a rigorous program of community service and financial penalty, is adequate – "but

not greater than necessary" – to satisfy both of those goals.  *United States v. Dorvee*, 616 F.3d 174, 182-83 (2d Cir. 2010).

**b.**     **Probation Coupled with Community Service and a Significant Fine is a Punitive Measure**

Probation is a significant punitive measure.  It is, in fact, punishment.  As the Supreme Court explained in *Gall*:

> Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.  Inherent in the very nature of probation is that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.'"

552 U.S. at 48 (citing *United States v. Knights*, 534 U.S. 112, 119 (2001)).  Indeed, and as further noted by the Court in *Gall*, "probation, 'rather than an act of leniency,' is a 'substantial restriction of freedom.'"  *Id*. at 44 (internal citations omitted).

Likewise, courts within this Circuit have acknowledged that probation is a punitive measure that may be used as an alternative to incarceration.  *See, e.g.*, *United States v. Colasuonno*, 697 F.3d 164, 180 (2d Cir. 2012) (concluding that probation is a form of criminal punishment); *United States v. Bailin*, No. 05 Cr. 48-01 (SWK), 2008 U.S. Dist. LEXIS 70365, at *4 (S.D.N.Y. Sept. 18, 2008) (asserting that the defendant's probation terms achieved the sentencing objectives of punishment and deterrence); *United States v. Leitch*, No. 11-CR-000609 (JG), 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013) ("[I]t bears emphasis that when a judge chooses between a prison term and probation, she is not choosing between punishment and no punishment. Probation is less severe than a prison term, but both are punishment.").

Further, with respect to the requirement of community service as a condition of the term of probation, the U.S. Probation Office has explained that community service is a "versatile condition that can," among other purposes, "serve as [a] publicly discernible *penalty*."  Administrative Office of the United States Courts Probation and Pretrial Services Office,

*Overview of Probation and Supervised Release Conditions*, at 65 (Nov. 2016), *available at*

https://www.uscourts.gov/sites/default/files/overview_of_probation_and_supervised_release_con

ditions_0.pdf (emphasis added). In addition to serving as a punitive measure, "the desired by-

product of community service is always to *benefit* the community." *Id*. (emphasis added).

Here, and in light of Cameron's record of volunteerism and service to others, a rigorous

term of community service as a condition of probation would have the added benefit of allowing

Cameron to continue to contribute to the community in a meaningful way.

### 5. A Non-Custodial Sentence of Probation Avoids Unwarranted Sentencing Disparities

In determining the appropriate sentence for Cameron, this Court must also consider "the

need to avoid unwarranted sentencing disparities among defendants with similar records who

have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Avoiding such disparities

is a key aspect of this Court's duty to "impose a sentence sufficient, but not greater than

necessary, to comply" with the purposes outlined in Section 3553(a). *See United States v.

Brennan*, 395 F.3d 59, 69 (2d Cir. 2005); *Dorvee*, 616 F.3d at 182-83; *United States v. Cavera*,

550 F.3d 180, 188-89 (2d Cir. 2008). The need to avoid unwarranted disparities with other

insider trading defendants sentenced in this and other districts further weighs in favor of a non-

custodial sentence. And, while not technically a Section 3553(a) factor, the treatment of

similarly situated defendants through only a civil SEC action is also instructive on the

inappropriateness of relying solely on improper gain/avoided-loss amounts in insider trading

cases.

### a. Comparable SDNY Sentences

The need to avoid an unwarranted sentencing disparity with other recent insider trading

defendants sentenced in this District also weighs in favor of a lenient sentence. As noted above,

Cameron's situation is unique. He differs from the typical insider-trading defendant in that he is not a financial industry professional, business professional, corporate lawyer, or trusted insider. His motivation was not to turn a profit. His activity was not part of a long-running scheme. Instead, he traded and passed along a single example of information to a few others, "to avoid a large financial loss to himself and to his fiancée's family members." PSR at 31. Further, at the time of the offense he was very young: only 24 years old. Conversely many – if not all – of the insider trading defendants recently sentenced in this District were more seasoned professionals, tenured in their careers, and involved in far more egregious conduct.

In these recent insider trading cases, the Government often relied on several "aggravating factors" as justifications for higher sentences, including:

- the scope of the unlawful trading, whether in duration or volume (*see also* Section II.B.3(c), *supra*);

- the defendant's professional background;

- the defendant's bribing of any tippers or otherwise directly paying for inside information (or conversely, receipt of bribes in exchange for providing inside information);

- the defendant's motivations to use the inside information to maximize profits; and

- the amount of any "gain" based on profits or losses avoided.

*See, e.g.*, *United States v. Hobson*, No. 1:16-cr-00351-LTS-2 (S.D.N.Y. 2017) (defendant investment advisor sentenced to six months' incarceration for involvement in six-year-long

scheme for personal profit);[7] *United States v. McClatchey*, No. 1:16-cr-00369-KPF-2 (S.D.N.Y.

2017) (defendant, a director at an investment bank, sentenced to five months' incarceration for

role in scheme that involved trading in advance of more than ten separate mergers and

acquisitions, and for which he received cash in exchange for confidential information);[8] *United*

*States v. Chow*, No. 1:17-cr-00667-GHW-1 (S.D.N.Y. 2017) (defendant partner at a private

equity firm sentenced to three months' incarceration for role in 17-month-long scheme resulting

in over five million in profitable trades);[9] *United States v. Zoquier*, No. 1:17-cr-00503-AJN-4

(S.D.N.Y. 2017) (defendant sentenced to three months' incarceration in scheme that lasted over

one year in duration).[10] Such aggravating factors are lacking here.

Even where such aggravating factors were present and recognized by the Court,

defendants still received significant variances below that of Probation's recommended sentence

for Cameron. For example, in *United States v. Stewart*, Stewart, a 61-year-old accountant, traded

on the basis of material, nonpublic information received from his son for personal profit. Ex. T,

Sentencing Tr. at 9:15, 21:9-16, No. 1:15-cr-00287-LTS-3 (S.D.N.Y. May 4, 2016). Stewart's

scheme lasted for four years and generated total profits of approximately $1.16 million. Gov't

Sentencing Mem. at 2, *United States v. Stewart*, No. 1:15-cr-00287-LTS-3 (S.D.N.Y. Apr. 27,

---

[7] *See* Gov't Sentencing Mem. at 3-4, *United States v. Hobson*, No. 1:16-cr-00351-LTS-2 (S.D.N.Y. Mar. 8, 2017), ECF No. 36; Final Judgment at 2 (S.D.N.Y. Mar. 24, 2017), ECF No. 37.

[8] *See* Gov't Sentencing Mem. at 3, *United States v. McClatchey*, No. 1:16-cr-00369-KPF-2 (S.D.N.Y. Jan. 3, 2017), ECF No. 20; Final Judgment at 2 (S.D.N.Y Jan. 12, 2017), ECF No. 22.

[9] *See* Gov't Sentencing Mem. at 4, 16, *United States v. Chow*, No. 1:17-cr-00667-GHW-1 (S.D.N.Y. Nov. 20, 2018), ECF No. 148; Final Judgment at 3 (S.D.N.Y. Jan. 29, 2019), ECF No. 152.

[10] *See* Gov't Sentencing Mem. at 2-3, *United States v. Zoquier*, No. 1:17-cr-00503-AJN-4 (S.D.N.Y. Mar. 3, 2019), ECF No. 150; Final Judgment at 2 (S.D.N.Y. Mar. 7, 2019), ECF No. 154.

2016), ECF No. 82. Following an analysis of the 3553(a) factors, the Court sentenced Stewart to four years' probation and 750 hours of community service, a variance from his advisory range of 30 to 37 months. Ex. T, Sentencing Tr. at 26:22-23, 32:8-12. Unlike Stewart, Cameron is not a licensed professional and did not engage in a sustained scheme involving multiple securities.

In *United States v. Rogiers*, a 35-year-old defendant and his co-defendants traded on misappropriated confidential corporate information. Gov't Sentencing Mem. at 1-2, No. 1:17-cr-00503-AJN-5 (S.D.N.Y. Dec. 14, 2018), ECF No. 107. Rogiers and others received the material nonpublic information from a friend who obtained it from a bank insider over a one-year period. *Id*. at 1. Rogiers and his co-defendants traded on the information to generate profits. *Id*. at 2. Rogiers received a sentence of three months' imprisonment and one year of supervised release, a variance from his advisory Guidelines range of 18 to 24 months. Ex. U, Sentencing Tr. at 8:19-20; 39:16-17, *United States v. Rogiers*, No. 1:17-cr-00503-AJN-5 (S.D.N.Y. Dec. 21, 2019). Unlike this case, Cameron was not a member of a trading ring involved in a lengthy effort to maximize profits from stolen confidential information. He acted impulsively following an emotional call with his father and over a few days, made a terrible mistake.

By any objective measure, Cameron is less culpable than these defendants, including those that received noncustodial sentences. Sentencing Cameron to a period of incarceration would result is a disparity between him and the numerous insider trading sentences mentioned throughout this memorandum, including those summarized above. Cameron should receive a sentence that reflects his own culpability, circumstances of the offense, and accounts for the unique attributes of his good character and personal characteristics. A non-incarceration sentence of probation coupled with a meaningful term of community service would satisfy the sentencing objectives of Section 3553(a) while avoiding any such disparities.

Without excusing Cameron's behavior or in any way suggesting that his guilty plea is

unfounded, we also note that many insider trading cases involving sums equivalent to or greater

than the loss avoided amount here are resolved civilly without criminal proceedings.  Indeed, in

many insider trading actions involving loss (or gain) amounts comparable or greater than those

attributed to Cameron individually ($571,000), or the total loss amount in this case ($768,520),

*see* PSR ¶ 35, the misconduct is not infrequently the subject of a civil action only without a

parallel criminal prosecution.

For example, in *SEC v. Lawson*, Lawson Software's co-chairman Herbert Richard

Lawson allegedly tipped his brother William Lawson and family friend John Cerullo with

nonpublic information about the status of the company's 2011 merger discussions with Infor

Global Solutions, a privately-held software provider.  *See* Complaint ¶ 1, No. 3:14-cv-02157

(N.D. Cal. May 12, 2014), ECF No. 1.  William Lawson and Cerullo each sold shares on the

basis of this nonpublic information, resulting in $1,557,385 of ill-gotten gains.  Ex. V, U.S.

Securities and Exchange Commission Press Release, *Three Software Company Founders to Pay*

*$5.8 Million to Settle Charges of Insider Trading Ahead of Sale* (May 12, 2014).  All three

defendants, Herbert Lawson, William Lawson, and John Cerullo, resolved the action by paying

various disgorgement, prejudgment interest, and civil monetary penalty amounts pursuant to

their respective settlements with the SEC.  *Id*.  Unlike Cameron, none faced criminal

prosecution.

In *SEC v. Williky*, a recidivist defendant allegedly was involved in an illegal market

manipulation and insider trading scheme that lasted nearly two years, avoiding approximately

$800,000 in losses.  *See* Complaint ¶¶ 1-3, 5, No. 1:15-cv-00357 (S.D. Ind. Mar. 2, 2015), ECF

No. 1.  Although Williky paid a civil monetary penalty and disgorgement plus interest, he did not

face criminal prosecution.  Ex. W, U.S. Securities and Exchange Commission Press Release,

*Court Bars Recidivist from Serving in Senior Positions in Public Companies* (Aug. 23, 2018).

Likewise, in *SEC v. Deeba*, the Chief Commercial Officer of a cloud security and services

company provided his two brothers with material, nonpublic information in advance of the

company's announcement of poor financial results.  *See* Complaint ¶ 1, No. 4:18-cv-05346 (N.D.

Cal. Aug. 30, 2018), ECF No. 1.  By trading on the basis of this information, the brothers

collectively avoided losses of $581,170.  Ex. X, U.S. Securities and Exchange Commission Press

Release, *SEC Charges Former Senior Executive At Silicon Valley Company with Insider Trading*

(Aug. 30, 2018).  Pursuant to the terms of his settlement with the SEC, Deeba agreed to pay a

civil monetary penalty and was barred from serving as an officer or director of any SEC-

reporting company for two years.  *Id*.  However, Deeba did not face criminal prosecution.

Similarly, in *SEC v. MacDonald*, the defendant – Philip MacDonald – allegedly was

tipped by a business associate concerning prospective business combinations.  Complaint ¶ 1,

No. 1:09-cv-05352-HB (S.D.N.Y. June 10, 2009), ECF No. 1.  MacDonald purchased securities

of eight different stocks on the basis of this information and, over a six month period, made

$900,000 in illegal profits.  *Id*.  Neither MacDonald nor any of the others involved in the scheme

were criminally prosecuted.  MacDonald's settlement with the SEC required him to disgorge his

profits.  Ex. Y, U.S. Securities and Exchange Commission Press Release, *SEC Settles Insider*

*Trading Charges Against Canadian Attorney* (Jan. 12, 2011).

We understand that prosecutorial discretion, the strength of available evidence, and the

existence or non-existence of a criminal referral by the SEC all play important roles in these

charging or non-charging decisions, and we take no issue with those factors.  Nor are we

suggesting in any way that Cameron should not have been charged criminally. He has accepted responsibility for his conduct and is facing the consequences. Our point is simply that the amount of illegal profit or loss avoided is less valuable as a factor for sentencing than the other 3553(a) factors noted above. We highlight these SEC civil cases only to demonstrate this point: defendants involved in insider trading cases with similar profit or loss-avoided figures do not always face criminal prosecution or concomitant periods of incarceration.

6. **A Non-Custodial Sentence of Probation with a Substantial Community Service Requirement and a Significant Fine Is Appropriate**

As noted above (*see* Section II.B.4 *supra*), courts have recognized that in an appropriate case, probation is sufficiently serious punishment to satisfy the statutory mandate that the sentence reflect the seriousness of the offense and provide just punishment. *See United States v. Brady*, No. 02 CR 1043(JG), 2004 WL 86414, at *8-9 (E.D.N.Y. Jan 20, 2004) (probation "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing") (quoting U.S.S.G. Manual ch. 5, pt. B, introductory cmt.). In light of the specific circumstances of this case and Cameron's unique characteristics, "[a]ny term of imprisonment…would be counter effective by depriving society of [his] contributions," particularly where – as here – Cameron "understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." *Gall*, 552 U.S. at 44; *see also* PSR at 31 (noting that Cameron "understands the magnitude of his actions and the seriousness of the offense and is extremely remorseful and regretful of his actions."). Accordingly, we ask the Court to impose a non-custodial sentence of probation, with the condition that Cameron performs a rigorous program of community service of at least 500 hours per year of probation, along with a significant fine of $150,000. Cameron would, of

course, submit to any community service the Probation Department directs or deems appropriate. We do, however, suggest several organizations below where Cameron might serve his hours – either individually or in some combination. These organizations would benefit greatly from Cameron's talents and skills.

Habitat for Humanity, Collier County, Florida.

Habitat for Humanity is dedicated to eliminating substandard housing locally and worldwide through constructing, rehabilitating and preserving homes, advocating for fair and just housing policies, and providing training and access to resources to help families improve their shelter conditions. ██████████████████████████████ ████████████████████████████████████████████████. With the approval of the Probation Department, Cameron would work with Habitat for Humanity to construct additional homes for needy members of the Collier County community.

The City of Marco Island, Florida - Volunteer Beach Stewardship Program

The Volunteer Beach Stewardship Program educates and assists beachgoers and the broader Marco Island community. Volunteers in the program educate the public about applicable laws, local wildlife, and about how to support wildlife and beach conservation measures. Cameron would like to volunteer with the Program and conduct educational programs and engage in conservation efforts at the Program's direction.

St. Matthew's House

Since 1987, St. Matthew's House has served the homeless population in and around Naples, Florida. The faith-based organization provides support to those in need by providing food, shelter, clothing, and care for the sick and by visiting those in jail. The organization depends on volunteers to fulfill its mission, and Cameron could serve in any number of ways to

help the organization, including with kitchen assistance, or serving meals at Justin's Place Feeding Ministry.

Humane Society Naples

Humane Society Naples' mission is to shelter animals in times of need, locate life-long homes for animals, and advocate for responsible pet ownership. To this end, and addition to its shelter and adoption functions, the organization provides numerous outreach programs at schools and businesses to promote responsible pet ownership, including pet sterilization. The organization depends on volunteers to supplement its ranks, and Cameron could serve in any number of roles. These volunteer opportunities range from one-on-one work and interaction with the animals, something which is a strong fit with Cameron's prior community service experience, to front desk and operations work.

## III.    CONCLUSION

Cameron Collins is a good young man who made a bad mistake that was totally inconsistent with how he has lived his life. A sentence of incarceration would be greater than necessary here to achieve the goals of an adequate, "but not greater than necessary" sentence. For the reasons discussed above, an analysis of the 3553(a) factors counsel in favor of a significant variance. Cameron's activity involved one security over a few trading days, his conduct was a complete aberration from an otherwise law-abiding life, he is not an industry professional or gatekeeper, he acted impulsively, out of fear and concern for others, he has never been and will never be a danger to the community, he has zero chance of recidivism, he has already disgorged his avoided-losses in the SEC civil action and agreed to a permanent injunction, and he will be forever branded a felon. We therefore respectfully respect that the Court impose a non-custodial sentence of probation, with a substantial community service requirement and a significant fine as an adequate "but not greater than necessary" sentence.

Respectfully submitted,

January 9, 2020
New York, New York

CROWELL & MORING LLP

By: */s/ Rebecca M. Ricigliano*
Rebecca M. Ricigliano
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 895-4268
RRicigliano@crowell.com

Thomas A. Hanusik
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
THanusik@crowell.com

*Attorneys for Cameron Collins*