# EXHIBIT F

**SENTENCING MEMORANDUM ON BEHALF OF CAMERON COLLINS**

*United States v. Christopher Collins, et al.*
No. S1 18-CR-567 (VSB)



U.S. Department of Justice

Criminal Division

Office of Policy and Legislation · Washington, D.C. 20530

June 28, 2010

The Honorable William K. Sessions III
United States Sentencing Commission
One Columbus Circle, N.E.
Suite 2-500, South Lobby
Washington, D.C. 20002-8002

Dear Chief Judge Sessions:

Under the Sentencing Reform Act of 1984, the Criminal Division is required to submit to the United States Sentencing Commission, at least annually, a report commenting on the operation of the sentencing guidelines, suggesting changes in the guidelines that appear to be warranted, and otherwise assessing the Commission's work. 28 U.S.C. § 994(o). We are pleased to submit this report pursuant to the Act.

### *The Booker Aftermath and the Current State of Federal Sentencing*

More than five years after the Supreme Court's decision in *Booker v. United States*, 543 U.S. 220 (2005), Sentencing Commission data – and our prosecutors' experience in federal courts across the country – suggest that federal sentencing practice is fragmenting into at least two distinct and very different sentencing regimes. On the one hand, there is the federal sentencing regime that remains closely tied to the sentencing guidelines. This regime includes the cases sentenced by federal judges who continue to impose sentences within the applicable guideline range for most offenders and most offenses. It also includes cases involving crimes for which sentences are largely determined by mandatory minimum sentencing statutes. These crimes include many drug trafficking offenses and certain violent and gun offenses.

On the other hand, there is a second regime that has largely lost its moorings to the sentencing guidelines. This significant set of criminal cases includes those sentenced by judges who regularly impose sentences outside the applicable guideline range irrespective of offense type or nature of the offender. It also includes cases involving certain offense types for which the guidelines have lost the respect of a large number of judges. These offense types include some child pornography crimes and some fraud crimes, including certain frauds involving high loss amounts.

We are concerned by this evolution of federal sentencing into two separate regimes for several reasons. First, we think it leads to unwarranted sentencing disparities. More and more, we are receiving reports from our prosecutors that in many federal courts, a defendant's sentence will largely be determined by the judicial assignment of the case; *i.e.* which judge in the courthouse will conduct the sentencing. Scholarly studies are now beginning to reinforce these reports. This is extremely problematic. In our consideration of federal sentencing policy, we begin from the principle that offenders who commit similar offenses and have similar criminal histories should be sentenced similarly. This was the foundational principle of the Sentencing Reform Act of 1984. We are concerned that our sentencing system may be meeting this principle of sentencing reform less and less.

Second, we think the existence of these dichotomous regimes will, over time, breed disrespect for the federal courts. Trust and confidence in the criminal justice system is critical to successfully bringing justice to all and keeping crime rates low. To the extent that federal sentencing is an ongoing source of discord, disunity, and criticism, the reputation of the federal courts will be seriously damaged and the effectiveness of federal criminal justice will be compromised.

Third, we think certainty in sentencing is critical to reducing crime rates further and deterring future criminal conduct, but the current trends are towards less certainty. We have experienced dramatic reductions in crime rates over the past 20 years, and our collective goal should be to continue on this path in the most just way possible for years to come. The Sentencing Commission has an important role to play, and it includes ensuring that both certainty of punishment and equal justice in sentencing are achieved by the federal courts.

For all these reasons and more, we believe the Commission, in the 2010-2011 amendment year, should prepare a comprehensive report on the state of federal sentencing that reviews these issues and concerns. While we applaud the Commission for its continuing and valuable data releases over the last five years, we are disappointed that there has been no systemic analysis of federal sentencing since the *Final Report on the Impact of United States v. Booker on Federal Sentencing,* released in March 2006. Since that *Report,* Commission data have revealed troubling sentencing trends emerging across the country where, for example, certain districts are experiencing substantially higher departure and variance rates – and other districts substantially lower rates – than the national average. Federal sentencing has undergone a series of constitutional shocks, the full ramifications of which the Commission ought to explore

and report. The Commission's regional hearings and data releases have been important contributions to all those concerned about the impact of *Booker* on federal sentencing policy and practice. But we think more is needed.

We continue to urge the Commission to explore new ways of analyzing federal sentencing data in order to understand federal sentencing outcomes better, identify any unwarranted sentencing disparities, and determine whether the purposes of sentencing are being met. But most importantly, we urge the Commission to synthesize all of the information it has collected and to issue a report on the state of federal sentencing. We think the report should also lay out a way forward to address systemic concerns and ensure that the principles of sentencing reform – predictability, elimination of unwarranted disparity, and justice – are achieved. Going forward, the Commission should explore how to create a single sentencing regime that will earn the respect of the vast majority of judges, prosecutors, defense attorneys, Members of Congress, probation officers, and the public.

We also believe the Commission should conduct a review of – and consider amendments to – those guidelines that have lost the backing of a large part of the judiciary. These reviews should begin with the guidelines for child pornography possession offenses and fraud offenses. We discuss these issues in greater detail below.

## *Congressional Directives*

The Commission's first priority for the coming amendment year – even before the report we urge above – must be to respond to directives from Congress. The Commission is a product of Congress, exercises authority delegated by Congress, and should make its first priority to respond to congressional directives.

A. Report on Mandatory Minimum Sentencing Statutes

In the National Defense Authorization Act signed into law by President Obama last year, Congress directed the Sentencing Commission to submit a report to the House and Senate Judiciary Committees on mandatory minimum sentencing provisions in federal law. The congressional directive includes a variety of requirements for the report.

We believe the Commission should devote a significant part of this amendment year to completing its review and analysis of mandatory minimums – a key structural component of the federal sentencing policy – and the mandated report. As U.S. Attorney Sally Yates indicated in her testimony at the Commission's recent hearing on mandatory minimums, we hope the Commission's report will examine not only the data surrounding mandatory minimum sentencing laws, but also their place in achieving the goals of sentencing and improving public safety, their evolving role in light of the post-*Booker* advisory sentencing guidelines system,

their severity levels, their contribution, if any, to racial and ethnic disparities in sentencing, and their impact on the federal prison population.

B. Guideline Amendments to Address Congressional Directives

The comprehensive health care reform legislation signed into law by President Obama earlier this year contains a directive to the Commission to address the sentencing guidelines applicable to health care fraud offenses. This directive is based, in part, on Government Accountability Office estimates that as much as 10% of the budget for Medicare and Medicaid – amounting to almost $100 billion – may involve fraud, waste, and abuse. The Commission should make implementation of this directive, and any other legislation enacted into law by Congress that directs guideline amendments or amends the federal criminal code, a top priority for the coming amendment year. We believe guideline amendments that address health care fraud should include increasing the presumptive sentences for offenses involving more than $1 million in losses and clarifying that the aggregate dollar amount of fraudulent billings submitted to a health care program constitutes prima facie evidence of intended loss.

*Other Guideline Amendments*

Under current law, the Sentencing Guidelines are advisory only and are considered by federal district courts along with other statutory factors in determining sentences for convicted federal defendants. However, the guidelines remain a critical factor in federal sentencing and, we believe, generally should be the most important factor in federal sentencing. In addition to completing a structural analysis of federal sentencing and implementing congressional directives as discussed above, the Sentencing Commission should use this amendment year and the next to review individual guidelines that are in need of significant reform, address sentencing issues that pertain to critical enforcement and public safety goals, resolve circuit splits,[1] and address other court decisions involving the guidelines.

\* \* \*

A. Economic Crimes

The recent economic crisis has demonstrated the critical need to deter financial crime through effective criminal prosecutions and the imposition of certain and significant imprisonment terms for those convicted of such crime. Unfortunately, we have seen with increasing frequency district courts sentencing fraud offenders – especially high-loss fraud offenders – inconsistently and without regard to the federal sentencing guidelines. A recent letter signed by various former Attorneys General to a sentencing judge in a fraud case in Iowa

---

[1] *See* Braxton v. United States, 500 U.S. 344 (1991).

catalogued just some of these cases. *See, e.g., United States v. Ferguson*, No. 3:06-cr-00137-CFD (D. Conn.) (imposing sentences ranging from one year and one day to four years on five defendants whose guideline ranges included the possibility of life imprisonment and who were convicted of fraud leading to over $500 million in loss); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (imposing a 42-month sentence on the former president of a public company convicted of fraud leading to more than $50 million of loss); *United States v. Stinn*, No. 07-CR-00113(NG) (E.D.N.Y.) (imposing a 12-year sentence on a former CEO of a public company convicted of fraud leading to more than $100 million in loss and to a guideline range of life imprisonment); *United States v. Turkcan* (E.D. Mo.), (imposing a one year and one day sentence of imprisonment on a defendant who caused approximately $25 million loss). *See also United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010) (affirming a 25-year sentence for a Ponzi scheme involving a $40 million loss).

We think it is important for the Commission to examine these cases and others like them and the applicable sentencing guidelines. The current sentencing outcomes in these cases are unacceptable, and the Commission should determine whether some reforms are needed. Such reforms might include amendments to the sentencing guideline for fraud offenses, recommendations for new statutory penalties, or other policy changes. Because the applicable guidelines are complex and cover many different types of crime, we think the Commission's review of this issue will likely span more than one amendment year.[2]

---

[2] We believe several changes are needed to USSG §2C1.1 as well as §2B1.1 to address military procurement fraud and other related crimes that occur overseas. Specifically, we believe the Commission ought to add an enhancement in §2C1.1 – similar to one found in §2B1.1 – that increases penalties when the defendant acts to conceal the offense or make detection and prosecution more difficult. Unlike the fraud guideline, the guidelines for bribery/public corruption guideline (USSG §2C1.1) and kickback offenses (USSG §2B4.1) do not provide a sentencing enhancement for defendants who attempt to evade detection or increase the prosecutorial expenses associated with detection and investigation by committing a substantial part of their offense outside the United States. The accompanying background commentary to §2B1.1(b)(9)(B) explains that overseas offenses "are difficult to detect and require costly investigations and prosecutions" and "[d]iplomatic processes often must be used to secure testimony and evidence beyond the jurisdiction of United States courts."

In many overseas military procurement fraud cases, the ultimate charge brought against the contractor or public official involved is a bribery or other charge referenced to §2C1.1. In fact, such charges are often *more likely* in procurement fraud cases precisely *because* of the overseas component – *i.e.*, because the "fraud" on the initial government contract (inflation, bid-rigging, etc.) is very difficult to prove. For example, in one recent case brought against a U.S. Army employee working in Kuwait, the allegations leading to the investigation involved widespread apartment lease inflation, but the ultimate charge (bribery) was part of a sting operation. Although the prosecution of that offense involved the same detection and witness problems addressed in §2B1.1(b)(9)(B), §2C1.1 does not contain such an enhancement.

B. Child Exploitation Crimes

      We believe the Commission should complete its review of the sentencing guidelines applicable to child exploitation crimes and prepare a report to Congress that might include recommendations for reforming the current child exploitation guidelines. The goal of any such reform would be to update the guidelines to address changing technology and realities surrounding these offenses, improve the consistency of sentences across child exploitation crimes, and ensure that the sentences for certain child exploitation offenses adequately reflect the seriousness of the crimes.

      We think the report to Congress ought to recommend legislation that permits the Sentencing Commission to revise the sentencing guidelines for child pornography offenses and that suggests what any revised guidelines might look like. Over the last two decades, Congress has directed the Sentencing Commission to amend the guidelines for child pornography offenses on a number of occasions. *See Treasury, Postal Service, and General Government Appropriations Act of 1992*, Pub. L. 102-141, section 632, October 28, 1991, 105 Stat. 876; *Sex Crimes Against Children Prevention Act of 1995*, Pub. L. 104-71, December 23, 1995, 109 Stat. 774; *Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003* (the "PROTECT Act"*)*, Pub. L. 108-21, section 401, April 30, 2003, 117 Stat. 672-73. Collectively in these bills, Congress directed the Sentencing Commission to increase the base offense level and to add certain enhancements, including enhancements for the use of a computer in the commission of the crime and for the number of images involved in the crime.

      We believe changes in the use of technology and in the way these crimes are regularly carried out today suggest that the time is ripe for evaluating the current guidelines and considering whether reforms are warranted. Consideration ought to be given to updating many aspects of the child pornography sentencing guidelines to better calibrate the severity and culpability of defendants' criminal conduct with the applicable guideline sentencing ranges. Because the current guidelines are largely mandated by statute, though, legislation will be required to modify them.

C. Offense Levels for Guidelines Related to Drug Crimes and Other Crimes Subject to Mandatory Minimum Sentencing Provisions

      To comply with the congressional mandate that the sentencing guidelines be consistent with all applicable federal statutes, the Commission has tied its offense levels for drug offenses to applicable mandatory minimum statutes for these offenses. We think this is the correct policy. However, the Commission has not applied a clear policy for how to select a base offense level in the guidelines for crimes subject to a statutory mandatory minimum.

      We believe for crimes carrying a mandatory minimum, the Commission should generally choose a *base* offense level so that after accounting for regularly occurring aggravating and mitigating factors elsewhere in the guidelines manual, the low end of the guideline range for the

*final* offense level is not generally below the mandatory minimum statutory sentence. Using this principle, we think the Commission should review the guidelines applicable to drug offenses and other crimes that are subject to a mandatory minimum sentencing provision and determine whether any amendments consistent with this principle are warranted.

D. The "Categorical Approach" to Reviewing Predicate Offenses

We encourage the Commission to complete its review of the term "crime of violence" and the use of the "categorical approach" to determine whether certain prior convictions trigger higher statutory and guideline sentences. Few statutory and guideline sentencing issues lead to as much litigation as determining whether a prior offense is categorically a "crime of violence," an "aggravated felony," or a "drug trafficking offense." The litigation burden is particularly onerous on courts, U.S. Attorneys' Offices, and defenders with significant immigration dockets. Although the Supreme Court has employed the often murky "categorical approach" to define these terms as they appear in statutes (*see Taylor v. United States*, 495 U.S. 575 (1990); *Shepard v. United States*, 544 U.S. 13 (2005); and *Chambers v. United States*, 129 S. Ct. 687 (2009)), because of the advisory nature of the guidelines, we believe the Commission is free to simplify the determination within the guidelines manual and to advise Congress on how to do the same in federal statutes.

The examples of problems caused by this approach are countless, and we think this should concern the Commission because the approach has led the courts to inconsistent sentencing results. We have catalogued these inconsistent results for the Commission in the past. We do not believe defendants should receive dramatically different sentences simply because of varying practices in charging and record-keeping among the 50 states and thousands of counties and parishes throughout the United States. We are hopeful that the Commission's study will result in a resolution of this problem that will ultimately reduce the resources needed to litigate these cases – an important goal, particularly in light of the tremendous impact of the illegal immigration docket on the courts.

E. Environmental Crimes and Appendix A

There are a number of inaccuracies in the references in Appendix A for environmental crimes that have been revealed by some recent litigation, and we ask the Commission to address these as part of a miscellaneous amendment package. For example, in *United States v. Lewis, No. 4:09CR-2-M* (W.D. KY), which involved a violation of the Safe Drinking Water Act, the sentencing court used USSG §2Q1.2 based on the reference in Appendix A for the applicable statute, 42 U.S.C. § 300h-2. This guideline is specifically intended for environmental crimes involving hazardous or toxic substances or pesticides, none of which were involved in the case. A crime arising under 42 U.S.C. § 300h-2 involves improperly injecting material into the

ground; however, that material need not be designated hazardous or toxic or a pesticide.[3] We think the more appropriate guideline in the *Lewis* case was USSG §2Q1.3, which deals with conventional pollutants, and that Appendix A should refer to both guidelines to address different factual scenarios that occur in crimes under this law. There are several other issues with the Appendix A references for environmental crime that we believe also should be remedied:

1. Certain prohibited conduct is set out in 7 U.S.C. § 136j, although the relevant criminal provision for those prohibitions are set out in 7 U.S.C. § 136l. Thus, the Appendix A listings of 136, 136j, and 136k probably should be deleted.

2. Prohibitions are similarly set out in 15 U.S.C. § 2614, but the relevant criminal provisions for those prohibitions are set out in 15 U.S.C. § 2615(b). Thus, the first of these should be deleted from Appendix A.

3. Prohibitions are set out in 33 U.S.C. §§ 403 and 407, but the relevant criminal provisions for those prohibitions are set out in 33 U.S.C. §§ 406 and 411. Thus, the first two of those probably should be deleted from Appendix A. It is also feasible that the contaminants involved in prosecutions under 33 U.S.C. §§ 406 and 411 could be hazardous, toxic, or pesticides; thus, both USSG §§2Q1.2 and 2Q1.3 should be listed in reference to both statutes.

4. Section 1342 of title 33 U.S. Code addresses a permit program. It sets out neither prohibitions nor criminal sanctions, so it should be deleted from Appendix A.

5. Prohibitions are set out in 33 U.S.C. § 1907, but the relevant criminal provisions for those prohibitions are set out in 33 U.S.C. § 1908. Thus, the first of those should be deleted from Appendix A. It is also feasible that the contaminants in prosecutions under 33 U.S.C. § 1908 could be hazardous, toxic, or pesticides; thus, both USSG §§2Q1.2 and 2Q1.3 should be listed in reference to this statute.

6. The environmental crime of felony failure to notify under 42 U.S.C. § 11045(b)(4) is not listed in Appendix A. It should be added, and the appropriate guideline to which it should be linked is USSG §2Q1.2.

F. <u>Southwest Border Crimes and Offense Levels for Guidelines Related to These Crimes</u>

As the Commission heard in testimony provided at regional hearings held this past amendment cycle, the Southwest border region of the United States faces myriad cross-border law enforcement challenges. Alien smuggling and illegal narcotics, firearms, and human trafficking that originate in that region have a devastating impact on and pose national security

---

[3] Drinking water (either on the surface or as groundwater) may be contaminated to the point of making people sick and perhaps killing them by substances that are not categorized as hazardous, toxic, or pesticides. A good example is ordinary fecal matter, which may well carry pathogens that can profoundly affect human health.

concerns for both the United States and Mexico. Despite the very serious nature of these crimes, which are generally not subject to statutory mandatory minimum penalties, the sentences imposed for these crimes typically are just a fraction of the maximum statutory penalty provided for each offense and are often inadequate. We encourage the Commission to strengthen efforts to combat the narcotics and firearms trafficking of violent drug cartels as well as dangerous alien smuggling by reviewing the applicable guidelines to ensure that the recommended penalties truly are commensurate with the serious consequences of the crimes.

Much of the violence along the Southwest border region and Mexico is perpetrated by drug trafficking organizations vying for control of drug trafficking routes to the United States and engaging in turf battles over disputed distribution territories. In 2009, the number of Mexican drug-related homicides was over 8,000. Of the firearms recovered in Mexico and successfully traced, over 90% originated in the United States. Escalating federal law enforcement efforts to disrupt the illicit pipelines of arms that fuel violent drug cartels operating along the U.S.-Mexican border is a priority of the Administration and the Department of Justice. Thus, we encourage the Commission to review USSG §2K2. In particular, we ask the Commission to review USSG §2K2.1 in light of 18 U.S.C. § 922(a)(6), which makes it unlawful to make material false or fictitious statements in connection with the purchase of a firearm from a licensed federal firearms dealer. Though many firearms offenses are subject to relatively stiff statutory *maximum* penalties, they are often not subject to statutory *minimum* penalties. Thus, for example, in the case of a "straw purchaser" of a firearm who is prosecuted under 18 U.S.C. § 922(a)(6), the result – applying the advisory guidelines under circumstances where a straw purchaser rarely has any prior criminal record and, thus, is able to pass the required background check – is a sentence that is significantly less than the statutory maximum sentence of 10 years. Indeed, in straw purchaser cases, which our experience suggests many judges view as mere "paper violations," the typical applicable guidelines range is between 10 and 16 months with the possibility now that all could be satisfied by community confinement or home detention. In reviewing USSG §2K2.1, we ask the Commission to consider (1) increasing the penalties for crimes involving the illegal trafficking of semiautomatic firearms; and (2) adding enhancements for specific offender characteristics in cases where the offender either knew or should have known that a firearm was either being transferred to a prohibited person or to a foreign country.

With respect to human trafficking/alien smuggling, the Department observes that while the methods for smuggling humans typically involve conduct significantly more egregious than that involved in the illegal re-entry into the United States of a previously deported convicted felon, the guidelines of USSG §2L1.1 are calibrated such that they often are disproportionately lower than the guidelines typically applicable in illegal re-entry cases. Similarly, the Department believes that the guidelines in §2S1.3 pertaining to bulk cash smuggling do not adequately reflect the dangers resulting from the smuggling of large amounts of cash that ultimately fuel Mexican drug cartels. Thus, the Department encourages the Commission to review USSG §§2L1.1 and 2S1.3 with a goal toward reflecting the seriousness of these crimes in the recommended guideline sentences.

## Circuit Splits and Erroneous Court Decisions

We urge the Commission to continue to make the resolution of circuit conflicts a priority for this guideline amendment year, pursuant to its responsibility outlined in *Braxton v. United States*, 500 U.S. 344, 347-49 (1991). In this amendment year, we ask the Commission to resolve whether impermissible "double counting" occurs when the two-level enhancement of USSG §2B1.1(b)(8)(C) for violating a court order is imposed on defendants who willfully fail to pay child support under 18 U.S.C. § 228(a)(3). We also believe the Commission should address court decisions involving erroneous interpretation of the guidelines.

### A. *United States v. Bell*

In *United States v. Bell*, 598 F.3d 366 (7th Cir. 2010), the defendant was convicted at trial of willfully failing to pay child support, in violation of 21 U.S.C. § 228(a)(3), part of the Deadbeat Parents Punishment Act of 1998 (DPPA). He was sentenced to 24 months of imprisonment to be followed by one year of supervised release. In arriving at defendant's 24-month guidelines sentence, which is also the statutory maximum punishment, the sentencing court effectively reasoned as follows: (1) willful failures to pay child support are addressed in USSG §2J1.1 application note 2, which cross-references §2B1.1; (2) that guideline includes an enhancement for violations of court orders, *see* USSG §2B1.1(b)(8)(C); (3) because a cross-reference by default incorporates the "entire offense guideline," *see* USSG §1B1.5(a), the district court found that the enhancement was applicable to defendant's offense; and (4) because willful failure to pay a child support order always involves a violation of a court order, the enhancement was applied to defendant.

The court of appeals reversed in a unanimous published opinion. The court explained that impermissible "double counting occurs when the same conduct justifies two upward adjustments under the Sentencing Guidelines or the same underlying facts that establish an element of the base offense are used to justify an upward enhancement." 598 F.3d at 372. However, double counting "does not occur if the adjustment addresses a sufficient additional or separate aspect of the defendant's conduct, even if overlapping conduct supports both the underlying level and the adjustment." *Id.* Therefore, the court reasoned that the question in the case was "what conduct is addressed by the cross-referenced base-offense level." *Id.* More specifically, the question was "whether Bell's conduct . . . may be permissibly teased into severable 'aspects' for purpose of sentencing." *Id.* The court apparently concluded that defendant's offense conduct could not be so "teased" apart, ultimately explaining that, in its view, "there is no reason to believe conduct that always inflicts multiple distinct harms may validly receive a punishment enhanced on account of one of the harms." *Id.* at 373. Before reaching its ultimate holding, the court of appeals noted two objections. First, because the government had pointed out that "it is often the case that the offense level for a specific crime will always permit the inclusion of a particular enhancement," the court of appeals went out of its way to note that § 228(a)(3) was special, saying that "the difference between bank robbery and violations of the DPPA is that there is no analogous guideline provision for bank robberies that cross-references another guideline

provision where an enhancement would apply to the circumstances of every conviction under the statute." *Id.* at 372-73.

The court acknowledged that its decision conflicted with decisions of the Second and Eleventh Circuits, both of which permit double counting based on the distinct harms inflicted by a single crime. However, the court held that "we have not embraced the 'separate harm' theory of double counting." *Id.* at 373. Rather, the court held that it must focus "on the conduct that supports the enhancements." *Id.* Under Circuit Rule 40(e), the court's circuit-split-creating decision was circulated to the full Seventh Circuit, but a majority did not favor *en banc* review of the matter. *See id.* at 373 n.1.

We believe the better view of the relevant guideline provisions is that of the Second and Eleventh Circuits: the cross-reference provision by default incorporates the whole cross-referenced guideline, including the enhancements contained therein; and it makes sense that the advisory guidelines would account for both the child-defrauding and the court-defying aspects of the offense. *See United States v. Maloney*, 406 F.3d 149, 153-54 (2d Cir. 2005); *United States v. Philips*, 363 F.3d 1167, 1169 (11th Cir. 2004). In rejecting the reasoning of its sister courts of appeals, the Seventh Circuit relied on its conduct-based approach to impermissible double counting, as established in its prior case law. *See, e.g., United States v. Schmeilski*, 408 F.3d 917, 919 (7th Cir. 2005) (concluding that "[t]he separate adjustments for the number of minors exploited and for the fact that minors were exploited on multiple occasions are not premised on the same conduct[; a] defendant could receive the multiple victim adjustment without also engaging in a pattern of activity involving prohibited sexual conduct."); *see also Bell, 598 F.3d* at 372 (collecting cases).

We think the Commission should resolve this circuit conflict.

B.  *United States v. King*

In *United States v. King*, 595 F.3d 844, 847 (8th Cir. 2010), the Eighth Circuit addressed the issue of whether a defendant's conviction for a crime of violence *that did not receive criminal history points under USSG §4A1.1(a), (b), or (c)* could nevertheless serve as a predicate offense for career offender status under USSG §4B1.1.

In *King*, after pleading guilty to one count of possession with intent to distribute 50 grams of a substance containing cocaine base, in violation of 21 U.S.C. § 841(a)(1), the district court sentenced defendant as a career offender, pursuant to USSG §4B1.1, to a term of 196 months. On appeal of the denial of his motion to vacate that sentence pursuant to 28 U.S.C. § 2255,[4] the defendant argued that (1) the district court erred in applying USSG §4A1.2(a)(2) (the guideline setting forth the rule for assigning criminal history points to prior felonies) and

---

[4] In his plea agreement, the defendant waived his right to appeal directly any sentencing issues and thus, the government's motion to dismiss his initial direct appeal was granted. *Id.* at 847, 848. The defendant's plea agreement preserved his right to raise a claim of ineffective assistance of counsel in a collateral proceeding,

USSG §4B1.2(c) (the guideline setting forth which felony convictions may serve as predicates for consideration under the career offender guideline); (2) the district court erred in sentencing him under USSG §4B1.1 as a career offender inasmuch as only one of his prior felonies could serve as predicate for sentencing under the career offender guidelines; and (3) his attorney was unconstitutionally ineffective for having failed to raise these issues on appeal. *Id.*

At the time of his sentencing, the pre-sentence report ("PSR") concluded that the defendant was a career offender based on a prior felony drug conviction and two prior crimes of violence (namely, two convictions for resisting arrest). *Id.* at 848. Based on a total offense level of 34 and a criminal history category of VI, the PSR indicated the applicable guideline range for King to be between 262 and 327 months. *Id.* The defendant did not object to the PSR recommendations and, after granting the government's motion for a downward departure based on the defendant's substantial assistance, the district court sentenced the defendant to a term of 196 months of incarceration. *Id.* Notably, on appeal, the defendant conceded that the prior felony drug conviction was a career offender predicate, but disputed that either of the two convictions for resisting arrest could serve as predicates for career offender status as these convictions should not have been assigned criminal history points under USSG §4A1.2(a)(2) and, consequently, should not have been deemed "prior felony convictions" under USSG §4B1.2(c). *Id.* Under the defendant's interpretation, therefore, he would not have had "at least *two* prior felony convictions of either a crime of violence or a controlled substance offense" as required by the career offender guideline of USSG §4B1.1(a) (emphasis added).

Each of the offenses used to predicate King's career offender status was within a group of related offenses that had been sentenced together. 595 F.3d at 849. Specifically, the PSR indicated that the defendant had been sentenced in state court on *one* occasion to two groups of convictions. *Id.* The first group included four counts: (1) trafficking in drugs in the second degree (for which King received a ten-year suspended sentence); (2) unlawful use of a weapon (for which King received a four-year suspended sentence); (3) resisting or interfering with arrest (for which King received a four-year suspended sentence); and (4) third degree assault on a law enforcement officer (for which King received a one-year suspended sentence). *Id.* Each of the sentences was to run concurrently with sentences on the other counts in the group. *Id.* The PSR assigned a single criminal history point to the grouping of these four sentences, relying on USSG §4A1.1(c). *Id.* Both the defendant and the government agreed that the four counts were related (and, by inference, that they were appropriately grouped as a single sentence under USSG §4A1.1(a)(2)) and that the only count in the group that could potentially serve as a predicate for career offender status was the resisting arrest count. *Id.*[5] Observing that under the guidelines

---

however, and on that basis, the district court granted King a certificate of appealability on the issue of ineffective assistance of counsel in connection with failure to appeal defendant's status as a career offender. *Id*

[5] Because it did not involve the actual or intended "manufacture, import, export, distribution, or dispensing of a controlled substance," the drug trafficking conviction in this group is not a "controlled substance offense" under USSG §4B1.2(b) and, therefore, could not serve as a predicate offense for career offender status under USSG §4B1.1.

grouping rule, a court "use[s] the longest sentence of imprisonment if concurrent sentences were imposed[,]" *see* USSG §4A1.2(a)(2), the Eighth Circuit concluded that the drug trafficking offense of this group should nonetheless have received the criminal history point for the group as it was the longest sentence imposed, *see* 595 F.3d at 849.

The second group, sentenced on the same day as counts in the first group, included three counts: (1) possession of cocaine base (for which King received a four-year suspended sentence); (2) resisting or interfering with arrest (for which King received a four-year suspended sentence); and (3) possession of marijuana (for which King received a one-year suspended sentence). *Id.* at 849-50. Each of these sentences also was to run concurrently with sentences on the other counts in the group. *Id.* at 849. The Court of Appeals concluded that with respect to this second group, it was "unclear which [conviction] should receive a criminal history point" as the longest sentence the defendant received was imposed for both the possession of marijuana and resisting arrest convictions. *Id.* at 850. The defendant argued that under the rule of lenity, the criminal history point for the second group should be assigned to the possession of marijuana conviction – the conviction that could not serve as a predicate for career offender status. *Id.*[6]

According to the defendant, if criminal history points had correctly been assigned under the grouping rule, neither of his convictions for resisting arrest would have received criminal history points under USSG §4A1.1(a), (b), or (c). *Id.* at 849. Thus, because subparagraph (2) of USSG §4B1.2(c) requires that "the sentences for at least two of the aforementioned felony convictions are counted separately under the provisions of §4A1.1(a), (b), or (c)[,]" neither of King's resisting arrest convictions, he argues, could have constituted a "prior felony conviction[]" under career offender guideline 4B1.1(a). *Id.* at 849. Concluding that the guidelines contemplate that not all prior felonies will be assigned criminal history points under subsection §4A1.1(a), (b), or (c) because they are related to other offenses with which they are grouped and treated as a single sentence, the Eighth Circuit held that it was "clear" that "prior felony convictions" under the career offender guidelines are "only those that receive a point under [USSG] §4A1.1(a), (b), or (c)." *Id.* at 851. Thus, applying the rule of lenity, the Eighth Circuit found that it was unclear whether the defendant's convictions for resisting arrest had received points under subsection (a), (b), or (c) of §4A1.1, concluded that the district court erred in its sentencing of defendant, and remanded the case to the district court for re-sentencing. *Id.*

Important to the Eighth Circuit's decision was the notion that USSG §4A1.1(f)[7] – which directs the assignment of limited criminal history points for sentences that were not counted under §4A1.1(a), (b), or (c) because they were subsumed into a related group of sentences and

---

[6] Again, because the possession of marijuana conviction did not involve the actual or intended "manufacture, import, export, distribution, or dispensing of a controlled substance," it is not a "controlled substance offense" under USSG §4B1.2(b) and, therefore, could not serve as a predicate offense for career offender status under USSG §4B1.1.

[7] At the time of King's sentencing in 2005, USSG §4A1.1(f) did not apply to the grouping and scoring of King's sentences as it applied only where a crime of violence was "related" to another crime of violence and it exempted offenses committed on the same occasion. 595 F.3d at 850. King's sentences for resisting arrest would be scored today, however, under an amended and broadened USSG §4A1.1(f).

treated as a single sentence – evidences a guidelines presumption that not all felony convictions necessarily receive points under USSG §4A1.1(a), (b), or (c) and that, therefore, what might *otherwise* be a career offender predicate can be subsumed into a group where a non-predicate offense actually is assigned the criminal history point for the group and can elude USSG §4B1.2(c)'s definition as a "prior felony conviction[]" that was "counted separately under the provisions of §4A1.1(a), (b), or (c)." *See id.* at 850. We believe that the next amendment cycle presents an opportunity for the Commission to resolve this frequently recurring issue by clarifying the definition of "two prior felony convictions" in USSG §4B1.2(c) and thereby clarifying what constitutes a predicate felony conviction for purposes of the career offender guidelines of USSG §4B1.1.

*   *   *

*Conclusion*

The policy agenda we suggest here is substantial and will take more than one amendment year to complete. The range of issues represents the range of the Commission's statutory responsibilities: overseeing the systemic health of the federal sentencing system and its structural elements; addressing individual guidelines in need of reform; resolving circuit conflicts; addressing erroneous court decisions; and addressing the technical elements of the Guidelines Manual. We look forward to discussing all these issues with you and the other Commissioners with the goal of refining the sentencing guidelines and laying out a path for developing effective, efficient, fair, and stable sentencing policy long into the future.

Crime rates are at generational lows, and our goal is to continue to improve public safety while ensuring justice for all and the efficient use of enforcement and correctional resources. We appreciate the opportunity to provide the Commission with our views, comments, and suggestions.

Sincerely,

Jonathan J. Wroblewski
Director, Office of Policy and Legislation

cc: Commissioners
Judy Sheon, Staff Director
Ken Cohen, General Counsel