

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 16, 2020

BY ECF

The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

  Re: *United States v. Cameron Collins*,
    S1 18 Cr. 567 (VSB)

Dear Judge Broderick:

  The Government respectfully submits this letter in advance of the sentencing of Cameron Collins, which is scheduled for January 23, 2020. On October 3, 2019, Cameron Collins pleaded guilty to one count of conspiring to commit securities fraud, in connection with use of material, non-public information regarding Immunotherapeutics Limited ("Innate") to trade and tip others in June 2017. As reflected in the plea agreement between the parties and in the Presentence Investigation Report ("PSR") prepared by the United States Probation Office ("Probation"), the applicable United States Sentencing Guidelines range for the offense to which Cameron Collins pled guilty is 37 to 46 months' imprisonment. The Government believes that a sentence within this range is necessary in order to satisfy the objectives of Title 18, United States Code, Section 3553(a), and in particular to promote respect for the law, to provide just punishment for the offense, and to achieve general deterrence.

## FACTUAL BACKGROUND

  The facts of this case are well known to the Court and are fully laid out in the Presentence Investigation Report ("PSR") and the Government's submission in connection with the sentencing of Christopher Collins (ECF No. 155).

  In brief, from at least 2013 through the summer of 2018, the Collins family, including Christopher Collins ("Collins") and Cameron Collins ("Cameron") acquired substantial holdings in Innate, an Australian biotechnology company that traded on the Australian Stock Exchange and on the over-the-counter market in the United States. (PSR ¶¶ 18, 19.) In addition to being a significant shareholder, Christopher Collins also sat on Innate's board of directors, giving him access to material non-public information about the company that he had a duty not to disclose. (PSR ¶¶ 18, 23-25.)

From at least the summer of 2016 up to and including the summer of 2018, relatives and friends of the Collins family, including Cameron's fiancée Lauren Zarsky, her parents Stephen and Dorothy Zarsky, Stephen's siblings, a childhood friend of Stephen's, and a friend and neighbor of Cameron and Lauren, all acquired Innate stock based on the recommendation of Cameron or Stephen.  (PSR ¶ 22.)

On June 22, 2017, at 6:55 PM Eastern, Collins received an email from the CEO of Innate letting him and other Innate board members know that MIS416, Innate's only viable drug, had failed its clinical trial.  (PSR ¶ 27.)  The practical import of this information was that, as soon as the news of the failed drug trial became public, Innate's stock would become virtually valueless.  Collins replied to the CEO's email expressing dismay at the news and then, from the White House lawn, tried several times in quick succession to contact Cameron by cellphone.  (PSR ¶ 27.)  Collins waited approximately one minute after responding to the CEO's email before repeatedly attempting to reach Cameron.  (PSR ¶ 27.)  After several urgent minutes of phone tag, Collins and Cameron connected.  During their call, Collins tipped Cameron about the failed drug trial, and they agreed that Cameron would sell his shares in Innate if it were possible to do so.  (PSR ¶ 27.)

The same day that Collins tipped Cameron, Cameron and Lauren Zarsky drove to her parents' house and tipped Stephen and Dorothy Zarsky about the failed drug trial.  (PSR ¶ 28.)  The date when the drug trial results would be made available to the investing public, as opposed to insiders who had a duty not to disclose material non-public information, was still four days away.  (PSR ¶ 33.)  Cameron, Lauren, Stephen, and Dorothy agreed that they would sell their shares in Innate, and that Cameron would space out his selling activity in order to avoid depressing the price of the stock before Lauren, Stephen, and Dorothy sold their shares.  (PSR ¶ 28.)  Dorothy commenced selling her shares that same night in the presence of Cameron, Lauren, and Stephen.  (PSR ¶ 28.)

Later on the night of June 22, 2017, Innate issued a press release indicating that the Australian Stock Exchange, where the company was listed, would halt trading pending the announcement of the drug trial results.  (PSR ¶ 29.)  The company said nothing about whether the results, which remained confidential, were positive or negative.  The halt only affected the trading of Innate shares on the Australian Stock Exchange; it had no impact on the United States over-the-counter ("OTC") markets, where Innate shares were also trading.  (PSR ¶ 29.)  On June 23, Cameron began selling his Innate shares on the OTC markets.  (PSR ¶ 30.)  He did not sell all of his shares at once, but rather, as he had discussed with Lauren, Stephen, and Dorothy, spaced out his transactions.  He initially sold shares from his own apartment, but later in the morning on June 23 he sold shares from the home of Stephen and Dorothy Zarsky.  (PSR ¶ 30.)  Stephen and Dorothy Zarsky, meanwhile, sold all of their remaining shares of Innate on the morning of June 23.  (PSR ¶ 30.)  Lauren Zarsky's shares were also sold that morning; she was at work while Cameron accessed her brokerage account from Stephen and Dorothy's home and placed an order to sell her shares.  (PSR ¶¶ 30, 61.)

In the midst of his and his family members' massive selloff on the morning of June 23, 2017, Cameron was in frequent touch by phone with Collins.  (PSR ¶ 31).  As reflected in the chronology attached hereto as Exhibit A, following their conversation on the night of June 22 and prior to market open on June 23, Cameron placed a relatively small order to sell about 16,000

shares of Innate.  After that trade executed, Cameron called his father at 9:42 AM and the two spoke for over eight minutes.  Four minutes after that call ended, Cameron placed orders to sell over $100,000 worth of Innate stock.  Throughout the remainder of the afternoon, Cameron worked to sell his Innate stock in chunks, in some cases modifying the limit price, apparently in an effort to ensure that he sold as much of the stock as possible, at the highest price possible, without depressing the market.  Cameron and Collins spoke again for almost seven minutes at 11:32 AM.  Two minutes after that call concluded, Cameron placed additional orders to sell thousands of dollars in Innate stock.  They also spoke again for five minutes at 3:12 PM.  Trading and phone records suggest that, during this call, with Collins on the line, Cameron placed additional orders to sell Innate stock.  After the trading day, and over the weekend, Cameron and Collins spoke multiple times at length.

On the morning of Monday, June 26, 2017, prior to market open, Cameron made contact with a friend, identified as Individual-6 in the Superseding Indictment, and informed him of Innate's impending drug trial results, which had not yet been made public.  (PSR ¶ 32.)  As a result of Cameron's tip, Individual-6 sold all of his holdings in Innate.  (PSR ¶ 32.)

Throughout the day on June 26, Cameron continued to sell shares of Innate.  He continued his strategy of trading the stock in chunks, apparently to avoid depressing the share price.  He placed several orders just after market open.  He and his father spoke at 11:51 AM, a call that was again followed with Cameron placing additional orders to sell.  That night – after Cameron had sold over a million shares of Innate – the company released the failed drug trial results to the public.  (PSR ¶ 33.)  Upon the release of the news, Innate's stock price fell by 92%, subjecting investors who were not able to take advantage of inside information to heavy losses.  (PSR ¶ 33.)  By contrast, Cameron and his friends and family avoided the consequences of their investments.  Cameron avoided approximately $571,000 in losses, and Stephen Zarsky avoided approximately $143,900 in losses.  (PSR ¶ 35.)  Dorothy Zarsky and Lauren Zarsky avoided losses of approximately $22,600 and $19,440, respectively.  (PSR ¶ 35.)  Individual-6 avoided losses of approximately $680.  (PSR ¶ 35.)

On April 25, 2018, FBI agents came to Cameron's home to ask him questions relating to trading activity in Innate around the time that the failed drug trial results were made public.  (PSR ¶ 38.)  Cameron elected to speak with the agents, and to lie to them in order to divert law enforcement from the trail of evidence showing that he and his father had committed insider trading.  During the interview, Cameron provided an elaborate (but false) account of his decision to sell his Innate stock prior to the MIS416 announcement.  He stated that he planned to sell $1 million in Innate stock before the MIS416 announcement as a hedging strategy after reading about the Innate trading halt on an online forum.  Cameron denied repeatedly that his father informed him of the negative news regarding MIS416 and he claimed, falsely, that he was not certain whether Dorothy and Stephen Zarsky ever owned stock in Innate.  (PSR ¶ 38)

As the Government has argued elsewhere, there can be no doubt that the strategy of pretending that the Collins family's trading activity resulted from being spooked by the trading halt was both coordinated and premeditated.  (PSR ¶ ¶ 38, 41.)  When Collins was interviewed by the FBI, he provided substantially the same false explanation for his son's suspicious trading: that Cameron had been prompted to cash out his position in Innate after reading about the trading halt

on the internet. (PSR ¶ 38.) And in a separate interview, Lauren Zarsky told the FBI the same lie – that she had sold her shares in Innate because the mere fact of the trading halt had made her nervous.

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## DISCUSSION

As discussed below, the Government respectfully submits that after applying the sentencing factors set forth in Section 3553(a) to Cameron Collins's conduct, a Guidelines sentence is warranted in this case.

### A. The Need to Provide Just Punishment for the Offense

The need to provide just punishment for the offense militates in favor of a Guidelines sentence in this case. By exploiting his father's breach of trust for his own pecuniary benefit,

Cameron committed a serious crime that itself warrants a substantial term of incarceration. As Judge Rakoff has explained in a case that Cameron relies upon in arguing for leniency:

> As people have come to understand that insider trading is not only a sophisticated form of cheating but also a fundamental breach of trust and confidence, they have increasingly internalized their revulsion for its commission. While no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant. No sentence of probation, or anything close to it, could serve this purpose."

*United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012).

Cameron's conduct is more serious still, because he not only committed the underlying securities fraud offense, he took the further step of engaging in a coordinated effort with his father to lie to investigators and thwart efforts to uncover their wrongdoing. *See United States v. Mui*, 214 F. App'x 40, at *5 (2d Cir. Jan. 18, 2007) (approving district court's consideration of defendant's obstruction of investigation under Section 3553(a) and consequent imposition of higher sentence); *United States v. Vogler*, 763 F. App'x 18, at *19-20 (2d Cir. Feb. 26, 2019) (same); *United States v. Butters*, 588 F. App'x 12, at *13 (2d Cir. Dec. 11, 2014) (approving district court's consideration of defendant's false statements to law enforcement officials as evidence of his dishonesty which the district court viewed as discounting his after-the-fact statements of remorse). Justice requires that these actions be punished with a substantial prison term.

In seeking a sentence of probation, Cameron argues that his conduct in this case was "motivated out of fear and concern for others." (Mem. at 34). While the Government does not dispute Cameron's history of good works, it is wrong to describe the offense in this case as motivated primarily or even substantially by a concern for the wellbeing of those whom Cameron tipped. Cameron's trading for his own account dwarfs the other illegal trading in this case by a factor of 3:1, and is the primary driver of the Guidelines calculation. Put simply, this was an offense motivated by greed, and any effort to suggest otherwise is a distortion of the facts.

Moreover, as the Government argued in connection with the sentencing of Christopher Collins, the seriousness of the offense is exacerbated by the fact that Cameron, like his father, committed a financial crime without a financial need. The PSR recites in detail Cameron's substantial assets, many of them apparently gifted to him by his father. Cameron could well have afforded the financial loss that he avoided through his crime. His decision to violate the law rather than accept that loss bespeaks a sense of privilege and a cavalier approach to the rules that govern all people, whether rich or poor, that demand a substantial punishment.

Nor is it fair to describe Cameron's decision to engage in the offense as "impulsive" or the product of a "moment of weakness." (Mem. at 34-35). While it is true that the insider trading conduct occurred over only a few days, they were days of furious activity with multiple decision points at which Cameron could have reconsidered his decision to violate the securities laws. Indeed, as the attached chronology illustrates, Cameron placed dozens of sell orders over the course of several days. At any point during that time he could have reconsidered his decision to

trade, but he did not. After Innate's stock price collapsed, Cameron sold the remainder of his Innate shares, apparently to allow his father to release the misleading statement that he had "liquidated all his shares [in Innate] after the stock halt was lifted, suffering a substantial financial loss."

Moreover, as discussed, the offense conduct did not end with the trading. Ten months later, Cameron and his father committed a second crime when they told the FBI the false story that Cameron's stock sales had been prompted by the trading halt. Far from recognizing the wrongfulness of his criminal conduct, Cameron doubled down on it when he sought purposely to mislead investigators. Justice demands that he be punished accordingly.

### B.  The Need to Promote Respect for the Law and Afford Adequate Deterrence

The need to promote respect for the law and deter criminal conduct of this type also weigh in favor of a significant sentence. To quote Judge Rakoff again, "insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail." *Gupta*, 904 F. Supp. 2d at 355. Sentencing Cameron to a term of probation, or merely imposing a fine would risk sending the wrong message in this high-profile case: that prosecutions for insider trading are simply a price of doing business that can be written off by paying a fine. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

Cameron's lies to the FBI make the need to use the sentence in this case to promote respect for the law more pressing still. Cameron was not required to give a statement to the FBI, but he chose to do so. Moreover, the statement was not a simple denial of the allegations. Rather, by supplying the false narrative that his trading was dictated by the trading halt, Cameron sought to affirmatively misdirect the investigation. As the Government explained in connection with the sentencing of Christopher Collins, the sentence in this case must make clear to the public that lying to cover up criminal conduct is not functionally equivalent to remaining silent. Lies like those that Cameron told to the FBI waste scarce law enforcement resources and threaten to derail efforts to find the truth and enforce the laws. The sentence must reflect the seriousness of this conduct.

### D.  A Guidelines Sentence Is Appropriate

Finally, the Court should reject Cameron's arguments that imposing a Guidelines sentence in this case would be inappropriate or outside the norm for insider trading cases in this District. Much of Cameron's sentencing submission is devoted to the argument that the Guidelines place undue weight on the gain amount when calculating criminal culpability (Mem. at 22-28). Whatever the merits of these arguments in other cases, here the application of the gain table captures both the manner in which the degree of harm was uniquely within Cameron's control and the iterative way in which the insider trading offense occurred.

As to the first point, as noted, Cameron's Guidelines range is driven primarily by the volume of his own trading, which was entirely within his control. In other words, this is not a case where a primary or intermediate tipper is being held responsible for a significant volume of trading from which he did not receive any pecuniary benefit. Second, as discussed, Collins did not commit

the insider trading offense in one go, but rather through dozens of trades placed over several days, all of which aggregate to reach the gain number calculated in the PSR. Even if the Court were to credit the argument that a $50,000 illegal trade is not much different from a $500,000 illegal trade from the standpoint of determining moral culpability, there is clearly a moral difference between making one illegal trade and making dozens of such trades over the course of several days. In this case, the application of the gain table has the effect of capturing that difference.

At the conclusion of his sentencing memorandum, Cameron identifies a number of cases in which insider trading defendants have received minimal prison sentences or faced only civil sanctions, and suggests that these precedents dictate a sentence of probation for him. Ultimately, Cameron's argument is that his lifetime of good works justifies a sentence of probation, notwithstanding the seriousness of his criminal conduct. As Judge Rakoff recognized in *Gupta*, however, even where a defendant's criminal conduct is aberrational and his life is otherwise characterized by a series of good acts, the need to fashion a just punishment and ensure respect for the law weighs heavily in favor of a prison sentence. *See Gupta*, 904 F. Supp. 2d at 354 (noting that "[t]he Court can say without exaggeration that it has never encountered a defendant whose prior history suggests such an extraordinary devotion, not only to humanity writ large, but also to individual human beings in their times of need" and nonetheless imposing a prison term).

Ultimately, none of the precedents cited by Cameron presents the precise constellation of facts that this case does: a defendant who traded for his own benefit, without financial need, and later worked actively to obstruct the investigation of his crimes. For the reasons set forth above, Cameron's conduct warrants a substantial term of imprisonment. A sentence of probation, or anything close to it, would fail to serve the purposes of sentencing.

## CONCLUSION

For the reasons discussed above, the Government respectfully submits that a Guidelines sentence should be imposed on Cameron Collins.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

    /s/
Scott Hartman
Max Nicholas
Damian Williams
Assistant United States Attorneys
(212) 637-2357/1565/2298